

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| HEALTH CARE FOUNDATION OF GREATER KANSAS CITY, | ) ) ) | |
| Respondent, | ) ) | WD79340 |
| v. | ) ) ) | OPINION FILED: January 17, 2017 |
| HM ACQUISITION, LLC and HCA, INC., | ) ) ) ) | |
| Appellants. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable John M. Torrence, Judge**

**Before Division IV:** Mark D. Pfeiffer, Chief Judge, and
Thomas H. Newton and Cynthia L. Martin, Judges

HM Acquisition, LLC ("HM Acquisition") and HCA, Inc. ("HCA") appeal from the judgment entered by the Circuit Court of Jackson County, Missouri ("trial court"), after a bench trial, in favor of Health Care Foundation of Greater Kansas City ("Foundation") on the Foundation's petition for declaratory judgment, accounting, and specific performance. The trial court's judgment is affirmed in part, reversed in part, and modified.

## Factual and Procedural Background

Health Midwest, a Missouri nonprofit public benefit corporation, owned a number of hospitals in the greater Kansas City metropolitan area. In 2002, because of Health Midwest's lack

of access to capital necessary to maintain, expand, and renovate the facilities it owned, its board decided to explore the sale of its hospitals and other assets.

Health Midwest contacted HCA, a publicly-traded corporation with headquarters in Nashville, Tennessee, and the largest for-profit health care provider hospital chain in the nation, and solicited it to buy the assets of Health Midwest. This led to negotiations between the parties that were ultimately successful. Later that year, HCA formed HM Acquisition, a Missouri limited liability company, for the purpose of acquiring certain assets and liabilities of Health Midwest.

Health Midwest and HM Acquisition executed an Asset Purchase Agreement ("APA") on November 22, 2002. Under the terms of the APA, HCA agreed to serve as guarantor of HM Acquisition's performance and obligations. Under Section 2.1 of the APA, Health Midwest agreed to sell to HM Acquisition substantially all of its tangible and intangible assets, principally nine hospitals in the Kansas City metropolitan area, for the purchase price of $1.125 billion dollars. Under Article 5 of the APA, HM Acquisition agreed to certain post-closing operating covenants. Section 5.1 states:

> **5.1 Capital Improvements.**[1] Within two (2) years following the Closing Date, [HM Acquisition] will either spend or commit to spend at least Three Hundred Million Dollars ($300,000,000) in capital expenditures. In each of the three (3) years subsequent to the two-year period following the Closing Date, [HM Acquisition] will either spend or commit to spend at least Fifty Million Dollars ($50,000,000) in capital expenditures. Any amounts spent in any period that are in excess of the required amount for such period will be credited against amounts required to be spent or committed to be spent in subsequent periods. Moreover, any Permitted Capital Expenditures and any capital expenditures made by Seller or System Entities which are approved by [HM Acquisition] shall be credited against [HM Acquisition's] obligations under this Section 5.1. The amount of capitalized expenditures made under this Section 5.1 will be determined in accordance with [HM Acquisition's] then applicable accounting policies and procedures. The construction of new facilities by [HM Acquisition] will not materially detract from the required maintenance and necessary improvement of existing Facilities.

---

[1] Section 14.2 of the Asset Purchase Agreement ("APA") provides that: "The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement."

HM Acquisition also agreed in Section 5.14 to provide Health Midwest an annual report "setting forth in reasonable detail how it complied with the operating covenants, including a specific accounting of capital expenditures [HM Acquisition] agree[d] to make in accordance with Section 5.1."

Section 5.15 spelled out Health Midwest's remedies should HM Acquisition breach or not perform any of the Article 5 operating covenants:

> Breach or nonperformance of any operating covenant set forth in this Article 5 will entitle [Health Midwest] to the indemnification rights set forth in Article 13 and/or any and all other remedies at law or equity (including monetary damages suffered by the community as a result of such breach or nonperformance, specific performance, and restraining order, injunction or other equitable relief). In addition, if the annual report shows that, for any applicable period, [HM Acquisition] has not spent or committed to spend dollars on capital expenditures during such period at least equal to the amount [HM Acquisition] agreed to provide in Section 5.1, then [HM Acquisition] will immediately pay such shortfall to [Health Midwest]. Moreover, if [HM Acquisition] has not spent $450,000,000 on capital expenditures (and amounts paid to [Health Midwest] pursuant to this Section 5.15) within a reasonable period of time after the fifth anniversary of the Closing . . . , then [HM Acquisition] will immediately pay such shortfall to [Health Midwest].

Pursuant to Section 14.18 of the APA, HCA, as guarantor, "unconditionally and absolutely guarantee[d] the prompt performance and observation of [HM Acquisition] for each and every obligation, covenant[,] and agreement of [HM Acquisition] arising out of, connected with, or related to this [APA] or any ancillary documents hereto[.]"

Four days after the execution of the APA, Health Midwest filed lawsuits against the Attorneys General of Missouri and Kansas, challenging their attempts to exercise authority over the disposition of the proceeds of the sale of Health Midwest's public benefit assets. Section 8.5 of the APA provided that Health Midwest and HM Acquisition would cooperate to secure all necessary government approvals to consummate the transaction anticipated by the APA, including

3

from the Missouri and Kansas Attorneys General. Though the APA obligated Health Midwest to "take the lead" in any such efforts, Health Midwest was obligated to "include [HM Acquisition] in any such discussions." In the same section of the APA, the parties agreed to "prepare any document or other material which may be required by [the Missouri and Kansas Attorneys General] as a predicate to or result of the transactions contemplated" by the APA. Accordingly, Health Midwest[2] entered into a Settlement Agreement on July 23, 2003, with the Missouri Attorney General, wherein Health Midwest agreed to create the Foundation,[3] a Missouri nonprofit public benefit corporation, to receive eighty percent of the net proceeds of the sale and eighty percent of the net assets retained by Health Midwest upon its future dissolution. The Settlement Agreement provided that the Missouri Attorney General "specifically reserve[d] his right . . . to monitor HCA's[4] compliance with its obligations under the APA and to seek to enforce those obligations." The Settlement Agreement attached as an exhibit an agreement to be later executed ("Joinder Agreement") wherein foundations created in Missouri and Kansas[5] to receive shares of the proceeds paid to Health Midwest would become parties to the APA with HM Acquisition's consent. By virtue of the Settlement Agreement, the transactions contemplated in the APA were authorized to proceed.[6]

On February 19, 2004, the Joinder Agreement anticipated by the Settlement Agreement was executed by representatives of Reach Healthcare, the Foundation, Health Midwest, and HM

---

[2] In 2003, Health Midwest amended its articles of incorporation and became known as Community Health Group; however, for the sake of clarity in today's ruling, Community Health Group will be referred to as "Health Midwest."

[3] The Foundation was incorporated as "A Rising Tide—The Greater Kansas City Healthcare Foundation" and later changed its name to "Health Care Foundation of Greater Kansas City."

[4] The Settlement Agreement referred to HM Acquisition and its guarantor, HCA, collectively as "HCA."

[5] Reach Healthcare Foundation ("Reach Healthcare"), a Kansas nonprofit corporation created pursuant to a settlement agreement with the Kansas Attorney General, would receive 20% of the sale proceeds.

[6] The Settlement Agreement amended and replaced a Memorandum of Understanding that had been earlier reached in January 2003. The closing anticipated by the APA was thus permitted to proceed on March 31, 2003.

4

Acquisition. The Joinder Agreement identified Reach Healthcare and the Foundation as Health Midwest's "Transferees" as contemplated by the APA. In the Joinder Agreement, the "Transferees" agreed "to be bound by the provisions in the [APA] to the same extent as [Health Midwest]." Numbered paragraph 1 of the Joinder Agreement provided that Reach Healthcare and the Foundation each:

> (i) agrees to be made a party to the [APA] solely for purposes of assuming the obligations of [Health Midwest] thereunder and (ii) assumes and consents to be bound by all post-closing terms and conditions of the [APA] as [Health Midwest] . . . to the same extent as, and jointly and severally obligated with, [Health Midwest] . . . ; provided that the foregoing agreement, assumption and consent by [the Foundation] is not intended to, and does not, constitute an assignment of rights of [Health Midwest] under the [APA] pursuant to Section 14.3 of the [APA] and [HM Acquisition] does not hereby consent to any such assignment.

The parties further agreed that under no circumstances would Health Midwest be liquidated or dissolved until five years after the closing date of the APA. Numbered paragraph 4 of the Joinder Agreement stated:

> Each party shall be entitled to specific performance of any of the provisions of this Joinder or the [APA] in addition to any other equitable remedies to which such party may otherwise be entitled as a result of a failure by the other party to comply with its obligations hereunder or thereunder.

On October 2, 2009, the Foundation filed a four-count petition against HM Acquisition and HCA.[7] In Counts II, III, and IV, the Foundation sought to enforce certain covenants in Article 5 of the APA: for an accounting related to HCA's required reporting and compliance with the APA (Count II); for a declaration regarding HM Acquisition and HCA's compliance with Section 5.1 and 5.14 of the APA (Count III); and to order specific performance of the covenants in the APA (Count IV). The primary dispute related to the interpretation of Section 5.1 of the APA, and

---

[7] Count I sought a declaration regarding HM Acquisition's right, if any, to approve in advance certain grants made by the Foundation. Count I was voluntarily dismissed by the Foundation with prejudice on June 22, 2011.

whether HCA was entitled to take credit for the construction of new facilities in Independence and Lee's Summit in order to satisfy the $450 million capital expenditure requirements of Section 5.1.

On January 24, 2013, after two-plus weeks of evidentiary hearings, the trial court issued a ruling denominating 571 paragraphs (and 140 pages) of findings of fact and conclusions of law ("FOF"), in which the trial court concluded that HM Acquisition (as the purchaser under the APA) and HCA (as the guarantor under the APA) (collectively referred to hereafter as "HCA") had breached the APA in that:  (i) HCA was not entitled to take credit for the construction of new facilities in order to satisfy the APA's Section 5.1 requirements, which related only to capital expenditures for "existing Facilities" purchased by HCA; and (ii) HCA improperly attempted to take credit for "commitments" to spend claimed to have been made by HCA in alleged compliance with Section 5.1 of the APA.  The trial court preliminarily awarded the Foundation a total of $161,908,504, representing the trial court's calculation of the lowest shortfall sum due and owing under the APA; awarded the Foundation attorney's fees and costs; and ordered the parties to participate in a court-supervised accounting with a special master to determine whether the Foundation was owed additional shortfall amounts under Section 5.1 of the APA.

During the accounting phase with the special master, additional shortfalls totaling $77,536,321 were stipulated to exist.[8]  On December 9, 2015, the trial court issued its Judgment, awarding the Foundation $239,444,825 (total shortfall amount), plus $167,105,206 (prejudgment interest), plus $27,175,562 in attorney's fees, costs, and prejudgment interest on the fees and costs, for a total judgment of $433,725,593, with interest continuing to accrue thereon at nine percent per annum, compounded annually, from and after November 19, 2015.

---

[8] Though HCA stipulated to shortfall amounts during the accounting phase, it did so reserving its objection to excluding new construction expenditures from amounts it should be credited for capital expenditures pursuant to Section 5.1 of the APA, and its objection regarding the trial court's determination of what had to be demonstrated to establish a Section 5.1 "commitment to spend."

HCA timely appealed.

## Standard of Review

In a bench-tried case, the judgment of the trial court will be sustained by the appellate court "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We defer to the trial court's determination of the weight to be given the evidence and the credibility of the witnesses. *Brasher v. Craig*, 483 S.W.3d 446, 450 (Mo. App. W.D. 2016). The trial court is free to believe some, all, or none of the testimony of any witness. *Id.* We review the evidence in a bench-tried case "in a light most favorable to the judgment, accept it as true, and disregard any contradictory evidence." *Id.* (internal quotation omitted). In reviewing a court-tried case, "[t]he appellate court is primarily concerned with the correctness of the trial court's result, not the route taken by the trial court to reach that result." *Business Men's Assurance Co. of Am. v. Graham*, 984 S.W.2d 501, 506 (Mo. banc 1999). "Thus, the judgment will be affirmed if cognizable under any theory, regardless of whether the reasons advanced by the trial court are wrong or not sufficient." *Id.*

## Analysis

### *Point I – Standing*

In HCA's first point, it asserts that the Foundation lacked standing to bring this suit. Standing is a question of law that we review *de novo*. *Schweich v. Nixon*, 408 S.W.3d 769, 773 (Mo. banc 2013). To have standing, a plaintiff must have a legally protectable interest at stake arising from threatened or actual injury. *Id.* "A plaintiff has a legally protectable interest if the plaintiff is directly and adversely affected by the action in question . . . ." *Byrne & Jones Enters., Inc. v. Monroe City R-1 Sch. Dist.*, 493 S.W.3d 847, 851 (Mo. banc 2016).

7

The gist of HCA's argument is that the Foundation, via the Joinder Agreement, acquired Health Midwest's "obligations" under the APA but not its "rights," and thus had no standing to utilize remedial measures to compel HCA's compliance with Section 5.1 of the APA.

To address HCA's standing argument, we must necessarily interpret the terms of the Joinder Agreement and APA. Interpretation of a contract is a question of law, which we review *de novo*. *Newco Atlas, Inc. v. Park Range Constr., Inc.*, 272 S.W.3d 886, 891 (Mo. App. W.D. 2008). "The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003). We read the terms of a contract as a whole to determine the intention of the parties, and we give the terms their plain, ordinary, and usual meaning. *Id.* "Additionally, each term of a contract is construed to avoid rendering other terms meaningless." *Id.* "A construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense." *Id.*

The APA was the definitive acquisition agreement between the seller, Health Midwest, and the buyer, HCA. Section 14.3 of the APA provides that, subject to any contrary provisions, the APA "inure[s] to the benefit of and [is] binding upon the parties hereto and their respective legal representatives, successors and assigns." Section 14.3 of the APA further provides that "any transferee of funds of [Health Midwest] . . . shall become obligated hereunder in the same manner as [Health Midwest] and shall execute any agreements or other documentation to effect such obligation as [HCA] may reasonably request."

The APA anticipated the need to secure various governmental approvals as a condition to closing, and particularly the approvals of the Missouri and Kansas Attorneys General. Section 8.5 obligated the parties to the APA to cooperate to secure any required approvals, and in executing

8

documents required to do so. The Settlement Agreement between Health Midwest and the Missouri Attorney General constituted just such a document, and though not itself signed by HCA, was nonetheless negotiated with HCA's involvement, as found by the Judgment. In keeping with this fact, the Settlement Agreement attached an agreed form of the Joinder Agreement—a document which required HM Acquisition's signature—to evidence the Foundation's right to receive funds otherwise payable to Health Midwest pursuant to the APA and HCA's consent to same, as required by Section 14.3 of the APA.

In numbered paragraph 1 of the Joinder Agreement, the Foundation:

hereby (i) agrees to be made a party to the [APA] solely for the purposes of assuming the obligations of [Health Midwest] thereunder and (ii) assumes and consents to be bound by all the post-closing terms and conditions of the [APA] . . . to the same extent as, and jointly and severally obligated with, [Health Midwest] (including without limitation the obligations set forth in Section 12.6 and Article 13); provided that the foregoing agreement, assumption and consent by [the Foundation] is not intended to, and does not, constitute an assignment of rights of [Health Midwest] under the [APA] . . . and [HCA] does not hereby consent to any such assignment. . . . Without limiting the generality of the foregoing, [the Foundation] agrees to comply with the provisions of Section 14.3 of the Asset Purchase Agreement . . . .

HCA argues that, pursuant to this provision of the Joinder Agreement, none of Health Midwest's "rights" under the APA were assigned to the Foundation by the Joinder Agreement, leaving the Foundation with no remedy for HCA's argued failure to pay Section 5.1 shortfalls. Though the Joinder Agreement does state that none of Health Midwest's "rights" under the APA have been assigned, at the same time, the Joinder Agreement incongruently recognizes that the Foundation had acquired the right to receive funds payable to Health Midwest pursuant to the APA. And the Joinder Agreement incongruently affords "each party" (including the Foundation) the right to enforce by specific performance violated provisions of either the Joinder Agreement or the APA.[9]

_____

[9] Numbered paragraph 4 of the Joinder Agreement states:

9

To conclude, HCA's argument—that the Foundation assumed no enforceable rights by virtue of the Joinder Agreement—would render meaningless HCA's consent to the Foundation's status as the lawful transferee of Health Midwest's right to receive APA proceeds, and would render meaningless the Foundation's expressed right to resort to the Joinder Agreement's "remedies" provision.

This seeming conflict can be reconciled without rendering any provision of the Joinder Agreement meaningless. *See Dunn Indus. Grp., Inc.*, 112 S.W.3d at 428. HCA consented to the Foundation's lawful status as a "transferee" of funds otherwise payable to Health Midwest. HCA consented to the Foundation's "assum[ption] . . . [of] all post-closing terms and conditions of the [APA]" as if the Foundation were Health Midwest. And HCA agreed that the Foundation could specifically perform any violated provision of the APA impacting its rights as a transferee. The post-closing terms and conditions set forth in Section 5.1 of the APA, and the right described in Section 5.15 to insist on payment of a Section 5.1 shortfall, plainly inured to the benefit of the Foundation as HCA's transferee, and plainly fall within the scope of the Joinder Agreement's remedy provision. Though the Foundation did not "assume," *per se*, HCA's rights under the APA, it did not need to, as the Joinder Agreement afforded the Foundation the right to protect its lawful status as the transferee of funds otherwise payable to Health Midwest pursuant to the APA.

In summary, by executing the Joinder Agreement (which was agreed to and signed by HCA), the Foundation necessarily acquired a consented-to right to receive Health Midwest's proceeds from the APA, necessarily assumed Health Midwest's obligations under the APA, and necessarily acquired the remedial authority to enforce either the Joinder Agreement or the APA to

---

Each party shall be entitled to specific performance of any of the provisions of this Joinder or the [APA] in addition to any other equitable remedies to which such party may otherwise be entitled as a result of a failure by the other party to comply with its obligations hereunder or thereunder.

10

the extent appropriate to preserve its rights. Pursuant to the contractually created remedial authority, the Foundation was entitled to sue HCA to enforce the terms of the APA, including the Post-Closing Operating Covenants, relating to its rights as a transferee of funds otherwise payable to Health Midwest pursuant to the APA—which included the right to enforce the shortfall provisions expressed in Section 5.15 of the APA. The Foundation established its standing by showing that it has a "legally protectable interest at stake in the outcome of the litigation" so as to be "directly and adversely affected" by its outcome. *Byrne & Jones Enters., Inc. v. Monroe City R-1 Sch. Dist.*, 493 S.W.3d 847, 851 (Mo. banc 2016) (internal quotation omitted). "In contract actions, a party has a legally protectable interest at stake if it has a right to enforce the contract as a party thereto . . . ." *Gen. Motors Acceptance Corp. v. Windsor Grp., Inc.*, 2 S.W.3d 836, 839 (Mo. App. E.D. 1999).

Point I is denied.[10]

### *Point II – Necessary Party*

In HCA's second point, it asserts that the trial court erred in denying its motion to join Health Midwest as a necessary party under Rule 52.04(a). HCA contends that Health Midwest is a necessary party because: (i) it was a signatory to the APA; and (ii) if the Foundation has standing, Health Midwest is a co-obligee with a shared right to enforce HCA's Section 5.1 performance.

"We review the trial court's denial of relief under this Rule [52.04(a)] only to determine if it is supported by substantial evidence, is against the weight of the evidence, or it erroneously declares or misapplies the law." *Williams Pipeline Co. v. Allison & Alexander, Inc.*, 80 S.W.3d 829, 837 (Mo. App. W.D. 2002).

---

[10] Given our conclusion that the Foundation had standing pursuant to the terms of the Joinder Agreement, we need not and do not address the trial court's alternative legal conclusion in paragraph 516 of its Findings of Fact and Conclusions of Law that the Foundation had "special interest" standing.

HCA asserted as a defense in its answer that the Foundation's petition must be dismissed in whole or in part because the Foundation did not join Health Midwest as a party under Rule 52.04. In its motion to dismiss filed along with its answer, HCA raised the Foundation's failure to join Health Midwest as a necessary party and moved that Health Midwest be joined as a *cross-claim defendant*. There are two problems with HCA's procedure. First, "[t]he remedy for failure to join a necessary party is by motion to add a necessary party rather than by a motion to dismiss." *Edmunds v. Sigma Chapter of Alpha Kappa*, 87 S.W.3d 21, 27 (Mo. App. W.D. 2002). Second, Rule 55.32(g) provides that "[p]arties other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 52.04 and 52.05." "This language assumes 'a counterclaim or cross-claim' exists separate from the addition of the new party—it does not provide that non-parties may be added to assert a *new* cross-claim." *State ex rel. Cohen McNeile & Pappas, P.C. v. Blankenship*, 375 S.W.3d 233, 236 (Mo. App. S.D. 2012). Here, HCA claimed Health Midwest was a necessary party but did not file a Rule 52.04 motion. Even if we concluded that HCA's motion to dismiss constituted a motion to add a necessary party, HCA's argument still fails.

Rule 52.04(a) requires the joinder of a person if:

(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant.

"A necessary person is one who is so vitally interested in the subject matter that a valid judgment cannot be effectively rendered without their presence." *Williams Pipeline Co.*, 80 S.W.3d at 837.

12

"An 'interest' exists within the meaning of the Rule where there is a direct claim upon the subject matter of the action that the person will either gain or lose by direct operation of the judgment." *Id.* (internal quotation omitted).

Health Midwest created the Foundation to receive a percentage of the net proceeds of the sale of Health Midwest's assets to HCA pursuant to the terms of the APA. The parties to the transaction anticipated that Health Midwest would be liquidated or dissolved approximately five to six years after the closing date of the APA. In the Joinder Agreement, the Foundation agreed "to be bound by the provisions in the [APA] to the same extent as [Health Midwest]." In numbered paragraph 1 of the Joinder Agreement, the Foundation agreed to be made a "transferee" party to the APA for the purpose of assuming Health Midwest's obligations thereunder and assumed and consented to be bound by all post-closing terms and conditions of the APA jointly and severally with Health Midwest. Numbered paragraph 4 of the Joinder Agreement entitled each party "to specific performance of any of the provisions of this Joinder or the [APA] in addition to any other equitable remedies to which such party may otherwise be entitled as a result of a failure by the other party to comply with its obligations hereunder or thereunder," including the obligations assumed by HCA under the Post-Closing Operating Covenants.

"In determining which parties are required to be before the court, consideration is given . . . to the nature of relief requested and the interests to be adjudicated." *Dolphin Capital Corp. v. Schroeder*, 247 S.W.3d 93, 97 (Mo. App. W.D. 2008) (internal quotation omitted). In Counts II, III, and IV of the Foundation's petition against HCA, the Foundation sought to enforce certain covenants in Article 5 of the APA and requested an accounting related to HCA's required reporting and compliance with the APA (Count II), a declaration regarding HCA's compliance

with Section 5.1 and 5.14 of the APA (Count III), and specific performance of HCA's covenants in the APA (Count IV).

HCA contends that Health Midwest must be joined as a necessary party because it is a signatory to and co-obligee under the APA. We disagree. The Foundation petitioned for equitable relief. The rule that an action upon a joint contract cannot be maintained by one joint obligee without the joinder of co-obligees has long been recognized in Missouri as applicable only in actions at law. *Priest v. Oehler*, 41 S.W.2d 783, 788 (Mo. 1931). *See also State ex rel. Massman Constr. Co. v. Shain*, 130 S.W.2d 491, 497 (Mo. 1939); *Skidmore v. Back*, 512 S.W.2d 223, 235 (Mo. App. 1974) ("[O]ur Supreme Court has held [in *Priest*] that the proposition urged by the defendant, that one joint obligee must join with other joint obligees in suing upon a joint obligation, is inapposite to suits of an equitable nature.").

The interests of the Foundation and Health Midwest in enforcing HCA's obligations under the APA are similar, and complete relief has been accorded among the parties, even in Health Midwest's absence. In Health Midwest's "straw man" role as a conduit of the proceeds to the Foundation, Health Midwest neither gained nor lost by direct operation of the trial court's judgment. Health Midwest's ability to protect its interests under the APA have not been impeded or impaired by its absence from the action. Further, there is no "substantial risk" that HCA would be exposed to double or inconsistent obligations resulting from Health Midwest's absence as a party.

In conclusion, Health Midwest was not so vitally interested in the subject matter of the controversy that a valid judgment adjudicating HCA's obligations under the APA could not be

14

effectively rendered without its presence as a party. The trial court did not err in determining that HCA was not a necessary party to this action.[11]

Point II is denied.[12]

### *Points III, IV, and VI – Contract Interpretation*

HCA's Points III, IV, and VI require us to interpret Sections 5.1, 5.14, and 5.15 of the APA to determine whether, in addition to payment of the purchase price, HCA is contractually obligated to pay a shortfall because it failed to "spend or commit to spend" a minimum of $450 million in capital expenditures in the time and manner required.

### *Point III*

In HCA's third point, it asserts that the trial court erred in failing to enter judgment for HCA on the Foundation's claim for breach of Section 5.1 of the APA because the term "capital expenditures" in Section 5.1 of the APA is unambiguous, and includes capital expenditures for new construction, not just capital expenditures to improve the purchased hospitals.[13] In contrast

---

[11] HCA cites to three cases in support of its argument: *Fruin-Colnon Corp. v. Missouri Highway & Transportation Commission*, 736 S.W.2d 41 (Mo. banc 1987); *Roberts Holdings, Inc. v. Becca's Barkery, Inc.*, 423 S.W.3d 920 (Mo. App. S.D. 2014); and *Karsch v. Carr*, 807 S.W.2d 96 (Mo. App. E.D. 1990). In *Roberts Holdings*, the necessary party ruling related to a property dispute in which not all the entities with ownership interest were made parties to the replevin action; in *Fruin-Colnon* and *Karsch*, jointly and severally liable *defendants* were not parties. Here, the entity in question was a "straw man" entity for its transferee, the Foundation, the *plaintiff* in the case below. Health Midwest had nothing to lose or gain (*i.e.*, no property rights or claim to proceeds) from the Foundation's equitable relief litigation. Thus, the cases cited by HCA are inapposite.

[12] Given our resolution of this point, we do not address the applicability of the "virtual representation" doctrine relied on by the Foundation, particularly given the Supreme Court's observation in *Taylor v. Sturgell*, 553 U.S. 880, 904, 128 S. Ct. 2161, 2178, 171 L. Ed. 2d 155 (2008), that "[m]any opinions use the term 'virtual representation' in reaching results at least arguably defensible on established grounds. In these cases, dropping the 'virtual representation' label would lead to clearer analysis with little, if any, change in outcomes." (Citation omitted.)

[13] In the Foundation's response to HCA's third point, it contends as a threshold issue that HCA did not preserve for appeal the issue of whether Section 5.1 of the APA is ambiguous because HCA did not object at trial to the Foundation's introduction of extrinsic evidence and, in fact, introduced its own extrinsic evidence. We disagree.

In Count III of the Foundation's petition, it requested that the trial court enter a judgment declaring that the money spent by HCA on the construction of new facilities not transferred pursuant to the APA was not included toward satisfaction of HCA's covenant in Section 5.1 of the APA to make "capital expenditures" on the existing facilities. In HCA's answer, it admitted that it disagreed with the Foundation "on the following issues of interpretation of the APA: generally whether [HCA] has complied with Section 5.14 of the APA and specifically whether the term 'capital expenditures' in Section 5.1 of the APA may include the construction of new facilities." HCA also moved the trial court for partial summary judgment, asking the trial court to declare that Section 5.1 of the APA permitted

15

to HCA's argued position on appeal, the trial court found Section 5.1 of the APA to be ambiguous, and the court resolved that ambiguity in favor of limiting creditable capital expenditures to those on existing Facilities acquired pursuant to the APA. As a result, HCA was not afforded credit against its Section 5.1 capital expenditure obligations for amounts spent or committed to be spent on building a new hospital in Lee's Summit and a new hospital in Independence.[14]

The interpretation of a contract is a question of law that we review *de novo*. *Belton Chopper 58, LLC v. N. Cass Dev., LLC*, 496 S.W.3d 529, 532 (Mo. App. W.D. 2016). "When we conduct a *de novo* review, the judgment may be affirmed on an entirely different basis than that presented to the trial court and can be affirmed on any theory that is supported by the record." *Id.* (internal quotation omitted). The cardinal rule of contract interpretation is to ascertain the intention of the parties and to give effect to that intention. *West v. Sharp Bonding Agency, Inc.*, 327 S.W.3d 7, 15-16 (Mo. App. W.D. 2010). "As with all questions of contract interpretation, we first attempt to ascertain the intent of the parties by looking at the words of the contract and giving those words their plain, ordinary, and usual meaning." *Belton Price Chopper 58, LLC*, 496 S.W.3d at 532

---

HCA to count expenditures on new construction toward its obligation to spend or commit to spend at least $450 million in "capital expenditures" within five years following the closing date. The trial court denied HCA's motion for partial summary judgment. While this ruling preserved nothing for appeal, *see Short v. S. Union Co.*, 372 S.W.3d 520, 537 n.22 (Mo. App. W.D. 2012), HCA did not abandon the issue at trial. Instead, in response to the Foundation's extrinsic evidence and in consideration of the trial court's summary judgment ruling, HCA introduced its own extrinsic evidence regarding pre-deal negotiation history and post-deal, pre-litigation conduct to counter the extrinsic evidence being offered by the Foundation.

HCA's failure to object to the introduction of the Foundation's extrinsic evidence at trial in this bench-tried case waived any objection to its *admissibility* but did not waive on appeal consideration of whether the terms of the APA were ambiguous in the first instance. "When evidence of one of the issues in the case is admitted without objection, the party against whom it is offered waives any objection *to the evidence*, and it may be properly considered even if the evidence would have been excluded upon a proper objection." *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 766 (Mo. banc 2010) (emphasis added) (internal quotation omitted). So, while this court may properly consider any of the extrinsic evidence admitted without objection at trial, it is also proper for this court to first determine whether any ambiguity exists in the wording of the APA necessitating such evidentiary considerations.

[14] The existing Facilities acquired by HCA pursuant to the APA included a hospital in Lee's Summit, and two hospitals in Independence. These existing Facilities were closed after HCA built the new Lee's Summit Hospital and Centerpoint Medical Center.

(internal quotation omitted). "We determine this intent based upon the contract language alone unless its terms are ambiguous." *Id.*

"[A]mbiguity arises only where the terms are reasonably open to more than one meaning, or the meaning of the language used is uncertain." *Woods of Somerset, LLC v. Developers Sur. & Indem. Co.*, 422 S.W.3d 330, 335 (Mo. App. W.D. 2013) (internal quotation omitted). "Ambiguity does not arise merely because the parties disagree over the meaning of a provision, and courts may not create ambiguity by distorting contractual language that may otherwise be reasonably interpreted." *Id.* Where the contract language is ambiguous, a question of fact arises, and the parties' intent must be established by extrinsic or parol evidence. *West*, 327 S.W.3d at 15.

HCA argues that the trial court erred in failing to grant it judgment on the Foundation's claim for breach of Section 5.1 of the APA because the term "capital expenditures" in Section 5.1 is unambiguous and includes new construction. We agree that the term "capital expenditures" is unambiguous and includes new construction. We do not agree, however, that as a result, the trial court erred in failing to grant judgment in HCA's favor on the Foundation's claim for breach of Section 5.1.

The Post-Closing Operating Covenant in Section 5.1 of the APA provides:

**Capital Improvements.** Within two (2) years following the Closing Date, [HCA] will either spend or commit to spend at least Three Hundred Million Dollars ($300,000,000) in capital expenditures. In each of the three (3) years subsequent to the two-year period following the Closing Date, Buyer will either spend or commit to spend at least Fifty Million dollars ($50,000,000) in capital expenditures. Any amounts spent in any period that are in excess of the required amount for such period will be credited against amounts required to be spent or committed to be spent in subsequent periods. Moreover, any Permitted Capital Expenditures and any capital expenditures made by [Health Midwest] or System Entities which are approved by [HCA] shall be credited against [HCA's] obligations under this Section 5.1. The amount of capitalized expenditures made under this Section 5.1 will be determined in accordance with [HCA's] then applicable accounting policies and procedures. The construction of new facilities by [HCA] will not materially

17

detract from the required maintenance and necessary improvement of existing Facilities.

Though the APA does not expressly define "capital expenditures," it effectively does so by directing that "[t]he amount of capital expenditures made under this Section 5.1 *will be determined in accordance with [HCA's] then applicable accounting policies and procedures*." (Emphasis added.) This provision in Section 5.1 of the APA was recognized by the trial court, which found that any expenditure for which HCA sought to take credit toward its obligation to spend or commit to spend as required by Section 5.1 "needed to be capitalized and made in accordance with HCA's 'then applicable accounting policies and procedures.'" (FOF ¶ 301) The trial court also found that the effect of this provision was to require expenditures claimed to be capital in nature to conform to Generally Accepted Accounting Principles ("GAAP"). (FOF ¶ 330) Neither of these findings is challenged on appeal.

Pursuant to GAAP, the term "capital expenditures" has a settled and accepted meaning insofar as it includes costs of new construction. "'It has long been recognized, as a general matter, that costs incurred in the acquisition . . . of a capital asset are to be treated as capital expenditures.' This principle has obvious application to the acquisition of a capital asset by purchase, but it has been applied, as well, to the costs incurred in a taxpayer's construction of capital facilities." *Comm'r of Internal Revenue v. Idaho Power Co.*, 418 U.S. 1, 12, 94 S. Ct. 2757, 41 L. Ed. 2d 535 (1974) (quoting *Woodward v. Comm'r of Internal Revenue*, 397 U.S. 572, 575, 90 S. Ct. 1302, 25 L. Ed. 2d 577 (1970)) (other citations omitted). In fact, applicable Internal Revenue Code regulations addressing capital expenditures "include the 'cost of acquisition, construction, or erection of buildings.'" *Id*. at 16 (quoting Treas. Reg. § 1.263(a)-2(a)).

In fact, the Foundation does not contest that the phrase "capital expenditures" has a common and accepted meaning. The Foundation conceded in its pleadings that "money spent on

18

the construction of new hospitals can be properly characterized as 'capital expenditures'"; that "there is no dispute that the APA recognizes that HCA, at the time it entered into the APA, was contemplating building new facilities within the Kansas City area"; and that "[i]n the present case . . . the parties agree on the meaning of 'capital expenditures.'" (L.F. at 2612) The Foundation reiterated during oral argument that it does not dispute that the term "capital expenditures" has a settled meaning which includes new construction.

Because the term "capital expenditures" possesses a commonly understood meaning, which includes within its ambit capital improvements to existing Facilities and the cost to construct new facilities, the term is unambiguous. Despite this conceded point, the Foundation argued, and the trial court agreed, that Section 5.1 is ambiguous because it was not clear *which* capital expenditures should be eligible for credit against HCA's $450 million capital expenditure obligation. We disagree.

Section 5.1 unambiguously provides that "[t]he amount of capitalized expenditures made under this Section 5.1 will be determined in accordance with [HCA's] then applicable accounting policies and procedures." Section 5.1 thus directs in plain and simple terms which capital expenditures are to be credited against HCA's $450 million capital expenditure obligation. As we have already explained, the trial court found that Section 5.1's reference to HCA's "then applicable accounting policies and procedures" necessarily referred to GAAP. Thus, substituting the commonly understood meaning of the term "capital expenditures," and this finding, accordingly, Section 5.1 plainly directed that "[t]he amount of [expenditures on existing Facilities or new construction] under this Section 5.1 will be determined in accordance with [GAAP]." There is no ambiguity in this directive. HCA was to have been credited with capital expenditures properly characterized as such pursuant to GAAP.

19

The Foundation nonetheless argues that, read as a whole, the APA reflects an intent to limit the capital expenditures for which HCA should receive credit to expenditures on existing Facilities. Though it is true that many provisions of the APA refer to the existing Facilities, no provision of the APA is rendered meaningless or ambiguous if Section 5.1 is given its plain and unambiguous meaning. In contrast, ambiguity is created only when Section 5.1 is not afforded its plain and unambiguous meaning. We do not resort to rules of construction to create an ambiguity where none exists. *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 429 (Mo. banc 2003).

Moreover, the Foundation's argument ignores its concession that the APA contemplated HCA's possible construction of new facilities. Nowhere is that point made clearer, in fact, than in Section 5.1 itself. The last sentence of Section 5.1 provides that "the construction of new facilities by [HCA] will not materially detract from the required maintenance and necessary improvement of existing Facilities." It is not a coincidence that this sentence refers to new construction and improvements to existing Facilities, both agreed-upon components of the settled meaning of the term "capital expenditure." Plainly read, the last sentence of Section 5.1 recognizes that even though HCA is contractually entitled to receive credit toward its Section 5.1 capital expenditure obligation for new construction and improvements to existing Facilities, that right is tempered by HCA's obligation to insure that new construction expenditures do not materially detract from necessary improvements to existing Facilities.[15]

In summary, Section 5.1 is unambiguous. Section 5.1 unambiguously permitted HCA to credit amounts "spent or committed to be spent" on the construction of Lee's Summit Hospital and

---

[15] Here, the trial court rejected the Foundation's contention that HCA's construction of two new hospitals materially detracted from required maintenance or improvements to existing Facilities. (FOF ¶¶ 245-275) In fact, the trial court found that there were no required or necessary improvements to the existing Facilities that were not made by HCA.

Centerpoint Hospital against its $450 million capital expenditure obligation. In this respect, Point III is granted.

However, our determination does not lead automatically to the conclusion that the trial court erred in failing to enter judgment in HCA's favor on the Foundation's claim for breach of Section 5.1 of the APA. The trial court found that Section 5.1 of the APA created four independent, temporal covenants,[16] the breach of any one of which supported a claim for breach of contract. This subject is addressed in our discussion of Point VIII on appeal, *infra*. And the trial court found that HCA improperly claimed "commitments to spend" in calculating its compliance with the temporal covenants set forth in Section 5.1, a subject we address in our discussion of Point VI on appeal, *infra*.

## *Point IV*

In Point IV, HCA argues that if Section 5.1 is deemed ambiguous, the trial court's interpretation is against the weight of the evidence because the weight of the evidence (albeit extrinsic) shows that the parties intended the term "capital expenditures" to include new construction. Point IV is rendered moot by our resolution of Point III on appeal and need not be further discussed.

## *Point VI*

In HCA's sixth point, it asserts that the trial court erred in failing to enter judgment in its favor on the Foundation's claim for breach of Section 5.1 of the APA because the Annual Reports HCA provided Health Midwest as required by Section 5.14 of the APA included representations that HCA would build new medical facilities that were sufficient to constitute "commitments to

---

[16] Section 5.1 provided that "[w]ithin two (2) years following the Closing Date, [HCA] will either spend or commit to spend at least Three Hundred Million Dollars ($300,000,000) in capital expenditures. In each of the three (3) years subsequent to the two-year period following the Closing Date, [HCA] will either spend or commit to spend at least Fifty Million dollars ($50,000,000) in capital expenditures."

21

spend" pursuant to Section 5.1. The essence of HCA's argument is that by expressing the intent to make capital expenditures in the future on a required Annual Report, HCA made a Section 5.1 "commitment to spend" that should be credited against its $450 million capital expenditure obligation. The trial court rejected this argument, finding that Section 5.1 requires any expenditure that can be counted toward Section 5.1's capital expenditure obligation must satisfy GAAP, and that the mere inclusion in an Annual Report of a stated intent to spend money in the future did not constitute a "commitment to spend" pursuant to GAAP. The trial court did not err in reaching this conclusion.

Once again, the plain and unambiguous language of Section 5.1 of the APA controls. As noted, Section 5.1 provides that "[t]he amount of capitalized expenditures made under this Section 5.1 *will be determined in accordance with [HCA's] then applicable accounting policies and procedures*." (Emphasis added.) And as noted, the trial court found that HCA's then applicable accounting policies and procedures necessarily referred to GAAP. HCA advances no argument on appeal to explain how the mere inclusion of a planned future expenditure on an Annual Report required by the APA constitutes a "commitment to spend" *in accordance with GAAP*.

The plain language of Section 5.14 further undercuts HCA's contention. In order to establish compliance with the four temporal covenants set forth in Section 5.1, Section 5.14 required HCA to submit each year to Health Midwest a report "setting forth in reasonable detail how it complied with the operating covenants, *including a specific accounting of capital expenditures [HCA] agrees to make in accordance with Section 5.1*." (Emphasis added.) Section 5.14 thus cross-references Section 5.1, where "commit to spend" is necessarily calculated based on HCA's then applicable accounting policies and procedures: GAAP. In this context, then,

22

the trial court correctly concluded that HCA's bare recitation in its Annual Reports about a lump sum it intended to spend on "new hospitals" at an unspecified point in the future was insufficient to constitute the "specific accounting of capital expenditures [HCA] agrees to make" required by Section 5.14.

Point VI is denied.

### *Point V – Extrinsic Evidence Application of Law*

In HCA's fifth point, it asserts that the trial court erred in failing to enter judgment for HCA because it misapplied the law of the extrinsic evidence as it related to the trial court's interpretation of a purported ambiguity in Section 5.1 of the APA.

Given our ruling in Point III that the APA is unambiguous, however, we need not resort to a review of extrinsic or parol evidence; thus, we need not and do not evaluate the trial court's application of law with regard to the trial court's interpretation of such extrinsic or parol evidence.

Point V is denied.

### *Points VII and VIII – Issue of Harm Caused and/or Penalty Applied*

HCA's Points VII and VIII both address the issue of damages; therefore, we will consider them together. In HCA's seventh point, HCA asserts that the trial court erred in entering judgment for the Foundation because the Foundation failed to make a submissible case for breach of contract. In HCA's eighth point, it argues that the trial court erred in awarding the Foundation a "shortfall" of $239 million under Section 5.15 of the APA because the provision is an unenforceable penalty provision.

### *Point VII*

"[T]he general rule of the law of contracts is well settled that in certain cases a breach of contract may give rise to two *remedies*." *Magruder v. Pauley*, 411 S.W.3d 323, 331 (Mo. App.

23

W.D. 2013) (emphasis added) (internal quotation omitted). "One is an action at law for damages for the breach; *the other is a suit in equity for the specific performance of the contract*." *Id.* (emphasis added) (internal quotation omitted). HCA mischaracterizes the Foundation's suit as an action at law for damages for breach of contract. The Foundation's suit is an action in equity for specific performance; accordingly, the elements of a cause of action for breach of contract are inapplicable in this case.[17]

Point VII is denied.

### *Point VIII*

In its eighth point, HCA argues that because it is uncontested that HCA *actually* spent in excess of $450 million in capital expenditures within the five-year period following closing,[18] an award of shortfall damages based on shortfalls incurred in the separate, temporal covenant terms specified by Section 5.1 constitutes an unenforceable penalty. We disagree, as HCA's argument requires us to disregard the plain language of the APA.

Section 5.1 of the APA provides that within two years following the closing date, HCA will either spend or commit to spend at least $300 million in capital expenditures; and in each of the three subsequent years, HCA will either spend or commit to spend at least $50 million in capital expenditures. That totals expenditures or commitments to spend of $450 million over five years, but Section 5.1 expressly requires those expenditures or commitments to spend to be satisfied in four temporal increments.

---

[17] Even in a breach of contract action at law, "[p]roof of the existence of a contract and its breach make a submissible case on damages, no matter whether actual damages have been proven." *Hanna v. Darr*, 154 S.W.3d 2, 5 n.2 (Mo. App. E.D. 2004). And here, where required capital expenditures in excess of $100 million dollars have not been made, it can hardly be said that the record is devoid of evidence of damages.

[18] By including "new construction" within the ambit of capital expenditures, it is uncontested that HCA spent in excess of $450 million during the five-year term following closing on the APA. The two new hospitals built in Lee's Summit and Independence were completed, according to the record on appeal, in 2007 during either the third or fourth compliance period.

We have already explained that Section 5.14 required HCA to provide Health Midwest with an Annual Report detailing "how it complied with the [Article 5] operating covenants, including a specific accounting of capital expenditures [HCA] agrees to make in accordance with Section 5.1." Section 5.15 of the APA specifies remedies if HCA breaches or fails to perform any of the Article 5 operating covenants, including the payment of shortfalls if HCA does not spend or commit to spend the agreed amount on capital expenditures in the agreed-upon time frames. In pertinent part, Section 5.15 provides:

> In addition, if the [Section 5.14] annual report shows that, for any applicable period, [HCA] has not spent or committed to spend dollars on capital expenditures during such period at least equal to the amount [HCA] agreed to provide in Section 5.1, then [HCA] will immediately pay such shortfall to [Health Midwest]. Moreover, if [HCA] has not spent $450,000,000 on capital expenditures . . . within a reasonable period of time after the fifth anniversary of the Closing . . . , then [HCA] will immediately pay such shortfall to [Health Midwest].

The language in Section 5.15 is not that of a liquidated damages clause. "A liquidated damages provision is a measure of compensation, which, at the time of contracting, the parties agree will represent damages in case of breach." *Frank v. Sandy Rothschild & Assocs., Inc.*, 4 S.W.3d 602, 605 (Mo. App. E.D. 1999). "When such a clause represents a reasonable forecast of the harm caused by the breach and the harm is of a type that is difficult to accurately estimate, courts will enforce it as a liquidated damages provision." *Id.* at 606. "However, the provision must be formulated to compensate the plaintiff for damages he would suffer as a result of a breach of the contract; otherwise courts will construe it as a penalty clause designed primarily to compel performance and will refuse to enforce it." *Id.*

Rather, Section 5.15 recognizes that one portion of the consideration offered by HCA for Health Midwest's agreement to enter into the APA was the injection of capital in the temporal time frames required by the APA. In failing to fulfill its temporal obligations, HCA failed to afford

25

Health Midwest a portion of the consideration promised, entitling Health Midwest to recover the shortfall.

HCA's failure to satisfy Section 5.1's temporal expenditure obligations cannot be disregarded merely because HCA *ultimately* spent all that it was required to spend. HCA could satisfy its Section 5.1 $450 million capital expenditure obligations with "*commitments* to spend." In other words, by the end of the four temporal covenant terms described in Section 5.1, HCA was not required to have actually spent $450 million in capital expenditures. Instead, it is Section 5.15 which imposed the *additional* obligation on HCA to demonstrate *actual* capital expenditures of at least $450 million within a reasonable period of time *after* the four temporal covenant terms described in Section 5.1. Thus, HCA was subject to two distinct capital expenditure obligations: the *temporal obligations* to spend or to commit to spend described in Section 5.1, and the *obligation to actually spend* described in Section 5.15. The distinct shortfall recovery rights described in Section 5.15 recognize the independent nature of these contractual obligations. HCA could have satisfied its temporal obligations to spend or commit to spend set forth in Section 5.1, while breaching the obligation to actually spend described in Section 5.15. Conversely, as is the case here, HCA could have satisfied its obligation to actually spend set forth in Section 5.15, while breaching the temporal obligations to spend or commit to spend set forth in Section 5.1. HCA is not relieved of its breach of one contract provision by its performance of another.

Nor can it be said that awarding damages for breach of Section 5.1's temporal "spend or commit to spend" provisions is a "penalty" merely because HCA did not breach the "actually spend" provision described in Section 5.15. HCA's capital expenditure performance was required in specified temporal time frames for reasons that were important to the parties, and that were no doubt influenced by the public impact on the provision of health care; otherwise, the temporal

26

obligations would not have been inserted into the APA. HCA's breach of the temporal performance obligations is best measured by the temporal shortfall—the amount, not coincidentally, that the parties contractually agreed should be the appropriate measure of damages.

The trial court did not err in granting the Foundation the relief provided by Section 5.15 of the APA for HCA's shortfalls in satisfying the temporal capital expenditure obligations set forth in Section 5.1, although the amount of the shortfall awarded by the trial court must be modified given our determination that HCA should have been afforded credit for amounts spent or properly committed to be spent on new construction, discussed *supra*.

Point VIII is denied.

### *Point IX – Prejudgment Interest*

In HCA's ninth point, it asserts that the trial court erred in awarding prejudgment interest, compounded annually, from the date the Petition was filed because, as of that date, the measure of damages was unclear and disputed, and the amount of damages was neither liquidated nor reasonably ascertainable.

In the trial court's December 9, 2015 Judgment, it awarded the Foundation the sum of $239,444,825 as the aggregate shortfall amount. Though the trial court's ruling in January 2013 had denied the Foundation's request for prejudgment interest, the trial court reconsidered its ruling and, in its December 2015 judgment, ordered HCA to pay the Foundation prejudgment interest from October 2, 2009 (the date the lawsuit was filed) "at the statutory rate of 9% per annum pursuant to RSMO. § 408.020 and/or § 408.040, compounded annually . . . until this Judgment is satisfied in full[.]" Thus, at the time of the judgment in 2015, the trial court awarded prejudgment interest on the shortfall amount in the sum of $167,105,206. With the "compounding annually" feature in this judgment, the interest on the shortfall would soon exceed the amount of the shortfall.

In addition, the trial court awarded the Foundation attorney's fees (approximately $21,000,000) and costs (approximately $1,500,000) *and* ordered that HCA pay prejudgment interest, compounded annually, on the bulk of these fees and costs in the approximate amount of $5,000,000.

"In equitable actions, the determination of whether to award prejudgment interest is left to the discretion of the trial court." *McDonald v. Ins. Co. of State of Pa.*, 460 S.W.3d 58, 67 (Mo. App. W.D. 2015) (internal quotation omitted). *See also Carpenter v. Countrywide Home Loans, Inc.*, 250 S.W.3d 697, 704 (Mo. banc 2008); *Boyle v. Crimm*, 253 S.W.2d 149, 157 (Mo. 1952). When a claimant seeks an equitable remedy, the trial court may be guided by the equitable principles of fairness and justice when determining whether to award prejudgment interest. *Ins. Co. of N. Am. v. Skyway Aviation, Inc.*, 828 S.W.2d 888, 892 (Mo. App. W.D. 1992). If the trial court, in its discretion, awards prejudgment interest in an equitable action, the rate of interest should be that in section 408.020. *Vogel v. Lake Timberline Prop. Owners Voluntary Ass'n*, 741 S.W.2d 869, 872 (Mo. App. E.D. 1987). Prejudgment interest under section 408.020 may be awarded when the measure of damages is clear and ***when the amount due is liquidated or readily ascertainable***. *Am. Eagle Waste Indus., LLC v. St. Louis Cty.*, 379 S.W.3d 813, 835 (Mo. banc 2012).

Here, it simply cannot be reasonably said that the amount due was either liquidated or readily ascertainable at the time the petition was filed. Aside from the fact that the trial court's judgment itself spends over 100 pages explaining why it believed it needed extrinsic evidence to understand the "intent" of Section 5.1 of the APA (which obviously impacts calculation of the shortfall in the judgment), the trial court also considered it necessary to order the appointment of a special master to conduct a court-supervised accounting in order to determine the full extent to

28

which HCA satisfied (or failed to satisfy) its obligations under Section 5.1. The trial court stated that it appointed a special master to conduct the accounting because "this is clearly a 'matter of accounting and of *difficult computation of damages*,' as stated in Rule 68.01(b)." (Emphasis added.)

Specifically, the trial court ordered that the accounting include determinations with regard to HCA's compliance with Section 5.1, including whether the amounts claimed in the Second through the Sixth Annual Reports "for the existing Facilities were actually spent or properly committed to be spent by HCA in accordance with HCA's then applicable accounting policies and procedures." The trial court further ordered that the accounting consider:

> (1) whether expenditures in the existing Facilities for which HCA could properly take credit in accordance with the APA and this Court's findings were: (a) actually expended, and (b) actually capitalized in accordance with HCA's then applicable accounting policies and procedures; (2) whether and to what extent HCA had actually entered into agreements giving rise to obligations or otherwise entered into actual "commitments" for items relating to the existing Facilities and identified as "commitments" in any of the Annual Reports; and (3) whether and to what extent HCA properly accounted for the net book value of Medical Center of Independence, Independence Regional Health Center, Lee's Summit Hospital, and Baptist Lutheran Medical Center, and the equipment and other assets of those facilities upon their closing.

(FOF ¶ 563)

Simply put, we agree with the trial court that there were "difficult" accounting issues reasonably in dispute necessitating the use of a court-supervised special master. Thus, we conclude that the shortfall amount due under the APA was neither liquidated nor readily ascertainable when the Foundation filed its petition on October 2, 2009, nor as of the 2013 appointment of the special master. The trial court's conclusion to the contrary was an abuse of its discretion; thus, the trial court erred in that portion of the judgment awarding prejudgment interest.

29

HCA also contends that the trial court erred in awarding compound interest, both in its prejudgment interest award and all sums continuing to be owed under the judgment until the judgment is satisfied in full. Although we need not address HCA's contention as to the prejudgment interest award given our conclusion that the trial court erred in awarding the Foundation prejudgment interest at all, we must review HCA's claim of error as it relates to post-judgment interest.

Section 408.020 governs the rate of interest (nine percent per annum)[19] that a trial court may award but does not specify whether simple or compound interest[20] shall be applied. "Compound interest generally is not allowable on a judgment." *Wallemann v. Wallemann*, 817 S.W.2d 548, 549 (Mo. App. E.D. 1991). There are two exceptions to the general rule that compound interest is not available on judgments in Missouri. *Geisner v. Budget Rent A Car of Mo.*, 999 S.W.2d 265, 268 (Mo. App. E.D. 1999). "First, trial courts, sitting as courts of equity, may assess compound interest when justice requires it to serve the cause of equity." *Id.* "Second, compound interest is allowed if the parties consent to it in the contract or agreement in question." *Id.*

Here, the parties did not consent to compound interest in the APA. Therefore, the issue is whether justice required compound interest to serve the cause of equity. The Foundation contends that the trial court, as a court of equity, had discretion to award it compound interest. It argues that HCA was the Foundation's fiduciary, and as a result of HCA's failure to abide by its APA obligations, the Foundation lost investment income when HCA retained the compound component

---

[19] The parties do not dispute that the applicable interest rate is nine percent per annum.

[20] "Simple interest is interest computed solely on principal. Compound interest is interest upon interest; where accrued interest is added to the principal sum and the whole treated as a new principal for the calculation of interest for the next period." *Wallemann v. Wallemann*, 817 S.W.2d 548, 549 (Mo. App. E.D. 1991) (citation omitted) (internal quotations omitted).

of the interest and investment income it realized on the Foundation's principal for more than a decade.

"Missouri courts have upheld equitable awards of compound interest only when there has been a breach of fiduciary duty, such as self-dealing or commingling of funds." *Id. See also Palmer v. Palmer*, 805 S.W.2d 326 (Mo. App. W.D. 1991) (partner); *Armstrong v. Priest* (*In re Murdoch*), 31 S.W. 942 (Mo. 1895) (assignee for distribution among partnership creditors); *Bobb v. Bobb*, 4 S.W. 511 (Mo. 1887) (trustee); *Pomeroy v. Benton*, 77 Mo. 64 (1882) (partner); *Camp's Creditors & Distributees v. Camp's Adm'r*, 74 Mo. 192 (1881) (administrator); *In re Davis*, 62 Mo. 450 (1876) (executor); *Williams v. Heirs of Petticrew*, 62 Mo. 460 (1876) (administrator); and *Frost v. Winston*, 32 Mo. 489 (1862) (guardian). Those cases are distinguishable from the present case because the Foundation has not alleged that HCA engaged in self-dealing or commingling of funds. Additionally, HCA and the Foundation were parties to a contract with differing interests; therefore, HCA did not have a fiduciary relationship with the Foundation. *See Inauen Packaging Equip. Corp. v. Integrated Indus. Servs., Inc.*, 970 S.W.2d 360, 371 (Mo. App. W.D. 1998) ("It has long been the rule in our state that the existence of a business relationship does not give rise to a fiduciary relationship, nor a presumption of such a relationship." (internal quotation omitted)). Accordingly, the equitable exception to the general rule against compound interest does not apply in this case, and the trial court erred in awarding compound interest on the judgment.

Point IX is granted.

### Point X – Percentage of Shortfall Award

In HCA's tenth point, without reference to any legal authority for its position, it asserts that the trial court erred in awarding the Foundation 100% of the alleged "shortfall."

Rule 84.04(e) requires the appellant's brief to contain an argument section that discusses the errors included in the point relied on. "An argument should show how the principles of law and the facts of the case interact." *Nicol v. Nicol*, 491 S.W.3d 266, 270 (Mo. App. W.D. 2016) (internal quotation omitted). HCA's argument consists of one paragraph, to-wit:

> The trial court erred in awarding the Foundation 100% of the alleged "shortfall," because under the AG Settlement agreement, the Foundation is entitled to only 80% of APA-related proceeds and [Reach Healthcare] is entitled to the rest. *See* L.F.435 (Foundation identifying itself as "the party entitled to 80 percent of the monetary proceeds at trial"). [Reach Healthcare] is not a party to this litigation and never assigned its rights to the alleged "shortfall" to the Foundation.

HCA's argument lacks citation to relevant legal authority, fails to compare the facts of the case to any relevant principles of law, lacks any pertinent legal analysis, and is comprised mainly of unsupported conclusions. *See id*. at 271. An appellant has an obligation to cite appropriate and available precedent if it expects to prevail, and, if no authority is available, it should explain the reason why citations are unavailable. *Thummel v. King*, 570 S.W.2d 679, 687 (Mo. banc 1978). "Mere conclusions and the failure to develop an argument with support from legal authority preserve nothing for review." *Nicol*, 491 S.W.3d at 271 (internal quotation omitted). "If a party does not support contentions with relevant authority or argument beyond conclusory statements, the point is deemed abandoned." *Id.* (internal quotation omitted).

But even if we disregard HCA's Rule 84.04 violation, its point is without substantive merit. The record reveals that the Foundation and Reach Healthcare entered into an Agreement on April 19, 2011, with regard to the Foundation's pending lawsuit against HCA.[21] In that Agreement, Reach Healthcare expressly agreed to:

---

[21] In the Agreement's sixth recital paragraph, the parties identify the Lawsuit: "WHEREAS, [the Foundation] has filed a lawsuit against HCA and HM Acquisition, LLC that is currently pending in the Circuit Court of Jackson County Missouri, Case No. 0916-CV30692, seeking various remedies, including declaratory judgment and specific performance of the Asset Purchase Agreement ('Lawsuit')[.]"

> fully and forever waive, release, and relinquish any and all rights, claims, or interests that it may have or assert in or with regard to any funds that may be obtained by [the Foundation] . . . or any other person or entity from HCA, HM Acquisition, LLC or an affiliate of HCA or HM Acquisition, LLC through any judgment in or by settlement of the Lawsuit.

The Agreement, thus, contradicts the conclusory argument by HCA that the shortfalls awarded by the trial court should be reduced by Reach Healthcare's alleged percentage share of any judgment proceeds.

Point X is denied.

### *Rule 84.14 Adjustments to the Judgment*

By virtue of our rulings today, the trial court's judgment is affirmed in part, reversed in part, and should be modified accordingly. Rule 84.14 directs us to "give such judgment as the court ought to give" and, "[u]nless justice otherwise requires," to "dispose finally of the case." Accordingly, because we conclude that the trial court abused its discretion in excluding credit for capital expenditures for new construction toward the capital expenditure obligations therein set forth, and because we conclude that the trial court abused its discretion in awarding prejudgment interest and erred in ordering that compound interest accrue on all the amounts awarded in the judgment, in lieu of remanding this matter to the trial court, we modify the judgment pursuant to our authority under Rule 84.14 as follows:

1. We reverse that portion of the Judgment in favor of the Foundation and against HCA (that is, HM Acquisition, LLC and HCA, Inc., jointly and severally) in the amount of $239,444,825, which represented the collective amount of the stipulated shortfalls during the four reporting periods anticipated by Section 5.1.[22] HCA is entitled to credit against the stipulated

---

[22] The parties stipulated to shortfalls after court-ordered accounting procedures as follows: $200,819,610 for the period from April 1, 2003, through March 31, 2005; $4,459,707 for the period from April 1, 2005, through March 31, 2006; $6,525,288 for the period from April 1, 2006, through March 31, 2007; and $27,640,220 for the period from April 1, 2007, through March 31, 2008. HCA reserved its right to challenge the stipulated shortfalls based

33

shortfalls for $22,934,418 the trial court found it spent toward new construction of Lee's Summit Hospital during the first covenant period (FOF ¶ 279) and for $12,142,373 the trial court found it committed to spend in accordance with GAAP toward construction of the new hospital in Independence during the first covenant period (FOF ¶ 438, 448). HCA is also entitled to credit for the collective shortfall of $38,625,215 stipulated to for the second, third, and fourth covenant periods, as the trial court found that HCA committed to spend well in excess of that amount to build Lee's Summit Hospital as of January 2006, and as Section 5.1 directs that amounts spent in excess of the required sum in any covenant period shall be credited to the remaining covenant periods. Given these credits, we enter judgment in favor of the Foundation and against HCA (that is, HM Acquisition, LLC and HCA, Inc., jointly and severally) for shortfalls in the amount of $165,742,819.

2. We reverse that portion of the judgment that HCA (that is, HM Acquisition, LLC and HCA, Inc., jointly and severally) shall pay to the Foundation prejudgment interest on any sum of damages that the trial court itemized with regard to shortfall damages, attorney's fees, or costs, for the period from October 2, 2009 (the date the petition was filed), to December 9, 2015 (the date of final judgment), at the statutory rate of nine percent per annum, compounded annually.

We order, instead, that interest on $188,074,491 (representing shortfall damages of $165,742,819 as herein awarded and attorney's fees and costs of $22,331,672 itemized in the Judgment) accrue at the statutory rate of nine percent per annum, simple interest, from and after the date of Judgment, December 9, 2015, until the Judgment as herein modified is satisfied in full.

---

on whether it should be entitled to credit for amounts spent or committed to be spent on new construction, and based on whether the trial court correctly determined when an amount could be deemed committed to be spent for purposes of Section 5.1 credit. We have resolved both reserved issues in this opinion.

3.  As so modified, the trial court's Judgment is in all other respects affirmed.


_____
Mark D. Pfeiffer, Chief Judge

Thomas H. Newton and Cynthia L. Martin, Judges, concur.