

# SUPREME COURT OF MISSOURI
## en banc

| | | |
|---|---|---|
| JOAN L. ROBINSON, | ) | *Opinion issued May 12, 2020* |
| | ) | |
| Respondent/Cross-Appellant, | ) | |
| | ) | |
| v. | ) | No. SC97940 |
| | ) | |
| JOHN F. LANGENBACH, | ) | |
| JUDY LANFRI f/k/a | ) | |
| JUDY LONGBROOK, and | ) | |
| PERMA-JACK COMPANY, | ) | |
| | ) | |
| Appellants/Cross-Respondents. | ) | |

**Appeal from the Circuit Court of St. Louis County**
**The Honorable Kristine Allen Kerr, Judge**

Defendants John F. Langenbach and Judy Lanfri f/k/a/ Judy Longbrook appeal the circuit court's judgment on a jury verdict for plaintiff Joan Robinson on her claim that, as directors of the closely held Perma-Jack Company, they breached their fiduciary duty to her as a shareholder. The defendants argue her claim is really one for wrongful termination, which she could not bring as an at-will employee. They also appeal the circuit court's finding that they engaged in shareholder oppression and its order requiring them to buy Ms. Robinson's Perma-Jack shares. Ms. Robinson cross-appeals the way the circuit court determined the fair value of her shares in the buyout as well as its denial of prejudgment interest and attorney's fees.

This Court affirms. With respect to the breach of fiduciary duty claim, Ms. Robinson sued defendants as directors and majority shareholders for the loss of financial benefit flowing from her minority stock ownership due to her bad-faith removal from her position as company president and her removal from all involvement in the company. She did not sue Perma-Jack itself for lost wages or reinstatement.

And while defendants presented substantial evidence of their good faith, the jury believed Ms. Robinson's contrary evidence as it was entitled to do. That same evidence supported the circuit court's finding of shareholder oppression and its decision to order a buyout of Ms. Robinson's shares in light of the parties' inability to work together to govern the company and the worthlessness of Ms. Robinson's interest in the company in light of the oppression. The circuit court did not abuse its discretion in determining that, on the particular facts of this case and in light of the overlap in damages asserted on Ms. Robinson's claims for breach of fiduciary duty and for oppression, it was appropriate to apply certain discounts in determining the fair value of her shares. It also did not abuse its discretion in determining that, on these facts, equity did not require it to award prejudgment interest on an unliquidated sum and, for similar reasons, did not abuse its discretion in denying attorney's fees. The judgment is affirmed.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

This case comes to the Court following a dispute among three siblings as board members and shareholders of a closely held corporation, Perma-Jack. Perma-Jack is a franchisor of a foundation repair and stabilization system. It was founded by George Langenbach in 1975; he then retired in 1985, and his three children – John F. Langenbach,

2

Judy Lanfri f/k/a/ Judy Longbrook, and Joan L. Robinson – became equal shareholders of Perma-Jack. Together, the three served as its board of directors beginning in 1987.

Perma-Jack's bylaws vest the board of directors with the power to control and manage the corporation, including appointment of a president and secretary and any other officers the board may deem necessary. The bylaws also provide that "[a]ny officer or agent appointed by the Board of Directors may be removed by the Board of Directors whenever in the judgment of the Board the best interests of the corporation shall be served thereby." Under the bylaws, an action of the majority of directors present at a board meeting is an official act of the board.

Founder George Langenbach appointed Ms. Robinson as president and treasurer following his decision to retire in 1985 and after Mr. Langenbach declined the appointment. Before 2012, Mr. Langenbach served as Perma-Jack's vice president and secretary. Ms. Lanfri did not serve as an officer, played no role in Perma-Jack's day-to-day operations, and did not draw a Perma-Jack salary. At some point prior to 2012, Ms. Robinson's son, John, and Mr. Langenbach's daughter, Jessica, also were hired as Perma-Jack employees.

Over time, Mr. Langenbach and Ms. Lanfri ("Defendants") became dissatisfied with Ms. Robinson's management. Although at its peak the company had 15 franchisees, Perma-Jack was losing money between 2008 and 2010 and eventually dropped to a low of six franchisees. The defendants noted that, while the loss of business could be attributed in part to the economic recession, Ms. Robinson spent only about two hours per day at the offices and the other family members also worked fewer than normal business hours. The defendants believed the minimal hours Ms. Robinson devoted to company work resulted

3

in a lack of leadership and that these factors and a lack of professionalism were large causes of the drop in company business.

In 2010, Mr. Langenbach and Ms. Robinson discussed whether Ms. Robinson would be willing to retire or resign. There was conflicting evidence as to whether Ms. Robinson at first agreed to leave but then changed her mind. In any case, she did not retire or resign. Later that year, given the difficulties the company was experiencing, the three siblings and other Perma-Jack employees met, and Mr. Langenbach said he told everyone that they would need to work harder and devote more time to the company. Ms. Robinson did not recall Mr. Langenbach saying everyone needed to work harder, but she did recall everyone discussed "the new [Perma-Jack]," although it was not clear to Ms. Robinson exactly what that meant (it may have included use of licensees rather than franchisees).

All parties agreed that, after this meeting, the defendants never discussed with Ms. Robinson their dissatisfaction with her work, areas for improvement, or any plans to remove her. Nonetheless, from mid-2010 to mid-2012, Mr. Langenbach and his daughter, Jessica, took surreptitious notes of Ms. Robinson's alleged shortcomings. Between 2011 and 2012, the defendants also expressed their displeasure about Ms. Robinson to each other in written communications, including a comment by Ms. Lanfri that Ms. Robinson was not competent to run the company and that she was thinking of selling her stock because Ms. Robinson was going to "take us all down with her." Mr. Langenbach said he hoped she would not sell and asked Ms. Lanfri to make sure, if she were to sell, he and Ms. Robinson would not be equal shareholders as "I have been doing this always knowing I have an ace in the hole with you and me having 2/3rds of [Perma-Jack]. If [she] and I are

4

equal, I don't have a chance." In May 2012, Mr. Langenbach told Ms. Lanfri he wanted to get rid of Ms. Robinson immediately. Ms. Lanfri encouraged him to do so.

Ms. Robinson was not aware her siblings were planning to remove her until she received notice of a special board of directors meeting a few days before it was held in June 2012. The defendants voted to remove her as president and treasurer, although she technically remained on the board. The circuit court found that, thereafter, "she was excluded from [Perma-Jack]'s offices[1] and was provided with no salary, severance pay, benefits or dividends as a shareholder of [Perma-Jack]."[2] The company terminated her son John's employment the next day.

The defendants voted Mr. Langenbach in as president. In that role, he had the authority to control Perma-Jack's payroll. He began working 60 hours per week and increased his salary from $56,000 to $104,000 then and to $123,000 the following year. He also purchased a new company car for his use and paid himself a $15,000 bonus. His daughter, Jessica, began working 40 hours per week at a salary Mr. Langenbach increased from $52,000 to $75,000 to reflect her "longer and harder work." In 2013, Mr. Langenbach hired his other daughter, Alexis, to work part-time for $600 every two weeks. He also changed from a franchise system to a system of licensing agreements. Mr. Langenbach had been advocating for a shift to licensing agreements for some time, and he said Perma-Jack had gained 10 additional dealers since it adopted that new business approach.

---

[1] Following her removal, the defendants called the police to exclude Ms. Robinson from Perma-Jack's physical premises. Passwords to the company e-mail had been changed even before Ms. Robinson's removal to deny her access to the Perma-Jack account.
[2] The parties agree Perma-Jack has not paid dividends since 2004.

Following her removal, Ms. Robinson sued the defendants for breach of fiduciary duty to her as a shareholder.[3] She also sued the defendants and Perma-Jack under section 351.494[4] and requested one of "the panoply of equitable remedies available to the Court, for example, dissolution of [Perma-Jack], appointment of a receiver and/or custodian, and/or an order requiring the purchase of [Ms. Robinson]'s shares by any one or more Defendants following a court-ordered appraisal of the fair value thereof." The parties filed cross-motions for summary judgment.

The circuit court sustained the defendants' motion, finding they had authority to remove Ms. Robinson. Ms. Robinson appealed. The appellate court found the defendants, as a two-thirds majority of Perma-Jack's board of directors, could remove Ms. Robinson as an officer of the company, but it remanded because disputed issues of material fact remained regarding whether the defendants breached their fiduciary duties to Ms. Robinson or committed shareholder oppression. *Robinson v. Langenbach, 439 S.W.3d 853, 861 (Mo. App. 2014)*.

---

[3] She also brought a derivative claim on behalf of Perma-Jack. The circuit court stated at the close of the evidence that it granted the defendants' motion for directed verdict on that claim, while the judgment states the claim was withdrawn. In either event, Ms. Robinson did not raise any issue on appeal regarding the derivative claim.

[4] All statutory references are to RSMo 2016 unless otherwise noted. Section 351.494 provides:

> The circuit court may dissolve a corporation:
>
> ….
>
> (2) In a proceeding by a shareholder if it is established that:
>
> ….
>
> (b) The directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent[.]

6

On remand, the circuit court granted Ms. Robinson's motion for a separate jury trial on her breach of fiduciary duty claim, while it would hear her equitable claim for shareholder oppression. It overruled the defendants' motion in limine to exclude evidence of Mr. Langenbach's and his daughters' salary increases. At trial, the defendants renewed their objection but also questioned their own experts about the appropriateness of these salaries given Perma-Jack's value as a company.

The jury returned a verdict for Ms. Robinson and awarded her $390,000 for breach of fiduciary duty. After a bench trial, the circuit court concluded the defendants committed shareholder oppression in removing Ms. Robinson and their actions were not shielded by the business judgment rule because her removal was not undertaken in good faith. It did not order dissolution and, instead, ordered the defendants to purchase Ms. Robinson's shares for $59,000, which it found to be the "fair value" of the shares as of June 2012, the month in which Ms. Robinson was removed from the company. In determining the stock's fair value, the court applied a 10-percent marketability and a 15-percent minority discount[5] and awarded post-judgment interest at the statutory rate of 9 percent from the date of the judgment. It denied attorney's fees and prejudgment interest.

The defendants appealed, arguing they were entitled to a directed verdict or judgment notwithstanding the verdict ("JNOV") on Ms. Robinson's claim of breach of fiduciary duty because it was just a relabeled claim for terminating her employment and her status as a shareholder provided no fiduciary-rooted right to continued employment.

---

[5] These discounts are discussed in more detail below.

The defendants also claimed the circuit court abused its discretion to admit evidence of the salaries of Mr. Langenbach and his daughters and erred in finding shareholder oppression.

Ms. Robinson cross-appealed, arguing the circuit court erred in applying marketability and minority discounts to the value of her shares and abused its discretion in using June 2012 as the valuation date. She also appealed its denial of prejudgment interest and attorney's fees.[6] The appeals were consolidated. After opinion by the court of appeals, this Court granted transfer. *Mo. Const. art. V, § 10.*

## II.     BREACH OF FIDUCIARY DUTY VERDICT

### A.     Standard of Review

The defendants claim the circuit court erred in overruling their motion for JNOV on Ms. Robinson's breach of fiduciary duty claim and that the evidence was insufficient to support the verdict. "The standard of review for failures to sustain motions for directed verdict and for JNOV is essentially the same." *Fleshner v. Pepose Vision Inst., P.C., 304 S.W.3d 81, 95 (Mo. banc 2010).* "This Court must determine whether the plaintiff presented a submissible case by offering evidence to support every element necessary for liability." *Id.* To determine whether the evidence was sufficient "an appellate court views the evidence in the light most favorable to the verdict and the plaintiff is given the benefit of all reasonable inferences." *W. Blue Print Co., LLC v. Roberts, 367 S.W.3d 7, 14 (Mo. banc 2012).* Conflicting evidence and inferences are disregarded. *Fleshner, 304 S.W. 3d*

---

[6] In this Court, Ms. Robinson did not brief any issue involving injunctive relief briefed in the court of appeals. "Any material included in the court of appeals brief that is not included in the substitute brief is abandoned." *Rule 83.08(b).*

8

*at 95*. "This Court will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion." *Klotz v. St. Anthony's Med. Ctr., 311 S.W.3d 752, 769 (Mo. banc 2010)*.

### B.    Submissibility of Breach of Fiduciary Duty Claim

The defendants urge this Court to find Ms. Robinson had no claim for breach of fiduciary duty because she really just sued for wrongful termination, and, as an at-will employee, she had no right to continued employment just because she was a shareholder. They assert to hold otherwise is an expansion of and is inconsistent with Missouri employment law.

The defendants misunderstand the nature of Ms. Robinson's claim. Her claim is not an employment claim, and she does not assert the company could not fire her. Indeed, were it an employment claim, she would have brought it against her employer, Perma-Jack, for lost wages or reinstatement. She did not. Ms. Robinson instead brought a claim for breach of fiduciary duty against the defendants in their roles as her fellow directors and as controlling shareholders. To the extent the defendants assert she should have brought her claim against Perma-Jack and could not bring it as an individual action against them, they are mistaken.

"Missouri law is clear that officers and directors of public and closely held corporations are fiduciaries because they occupy positions of the highest trust and confidence and are required to exercise the utmost good faith when using the powers conferred upon them to both the corporation and their shareholders." *W. Blue Print Co., 367 S.W.3d at 15*; *see also Gieselmann v. Stegeman, 443 S.W.2d 127, 136 (Mo. 1969)* ("A

9

director of a corporation occupies a position of the highest trust and confidence and the utmost good faith is required of him in the exercise of the powers conferred upon him"). "[M]ajority shareholders owe a fiduciary duty to minority shareholders." *Peterson v. Cont'l Boiler Works, Inc., 783 S.W.2d 896, 904 (Mo. banc 1990).* This means:

> A director is a fiduciary. So is a dominant or controlling stockholder or group of stockholders. … Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.

*Pepper v. Litton, 308 U.S. 295, 306 (1939)* (internal citations omitted).

And while "the general rule is that shareholder actions against corporate officers and directors are derivative in nature" it is, nonetheless, the case that "[i]ndividual actions are permitted, and provide the logical remedy, if the injury is to the shareholders themselves directly, and not to the corporation." *Nickell v. Shanahan, 439 S.W.3d 223, 227 (Mo. banc 2014), quoting, Centerre Bank of Kan. City, Nat'l Ass'n v. Angle, 976 S.W.2d 608, 614 (Mo. App. 1998)*.

For this reason, "[a]ctions based upon torts where the injury is done directly to an individual shareholder, director or officer as such, depriving him of his rights, *for instance, wrongfully expelling him* … are actions which may be brought by shareholders as individuals." *Gieselmann, 443 S.W.2d at 131* (emphasis added); *see also Pepper, 308 U.S. at 307 & n.15* ("While normally that fiduciary obligation is enforceable ... through a stockholder's derivative action, ... [i]t is also clear that breach of that fiduciary duty may also give rise to direct actions by stockholders in their own right."). "A common theme in

10

these cases is that individual actions were permitted so that individual shareholders or discrete groups of shareholders could redress injuries unique to them rather than to the corporation as a whole." *Nickell, 439 S.W.3d at 227*.

Ms. Robinson claims a breach of fiduciary duty to her as an individual shareholder, stating "[a]s Directors and shareholders in control of [Perma-Jack], [Mr.] Langenbach and [Ms.] Lanfri owe a fiduciary duty to [Ms.] Robinson to refrain from using their control to obtain a profit for themselves at the injury or expense of [Ms.] Robinson, a minority shareholder [and] … to refrain from producing corporate action of any type that is designed to operate unfairly to [Ms. Robinson] as a minority shareholder." Ms. Robinson was the only shareholder voted out of her position as a company officer, denied management and participation rights in the company, as well as certain financial benefits, or who was excluded from Perma-Jack's physical premises.

Ms. Robinson alleged injury from these breaches, including "[a]s a direct and proximate cause … [she] has been damaged in that she has been deprived of all financial benefit from her minority stock ownership in [Perma-Jack] both presently and going forward into the future, including her and [her son] John's employment thereby, their salaries, her company vehicle, a company mobile phone, and life insurance, and all other benefits." Her pleadings adequately set out an action for breach of fiduciary duty.

The defendants also claim Ms. Robinson failed to make a submissible case of breach of fiduciary duty. "When breach of fiduciary duty is asserted as a tort claim, as here, the proponent must establish that a fiduciary duty existed between it and the defending party, that the defending party breached the duty, and that the breach caused the proponent to

11

suffer harm." *W. Blue Print Co., 367 S.W.3d at 15, quoting, Zakibe v. Ahrens & McCarron, Inc., 28 S.W.3d 373, 381 (Mo. App. 2000).* "Whether a fiduciary duty exists is a question of law, while the breach of that duty is for the trier of fact to decide." *Id., citing, Scanwell Freight Express STL, Inc. v. Chan, 162 S.W.3d 477, 481 (Mo. banc 2005).*

Ms. Robinson's breach of fiduciary duty instruction stated:

Your verdict must be for plaintiff Joan Robinson if you believe:

First, defendants John Langenbach and Judy Lanfri removed plaintiff Joan Robinson from Perma-Jack Company; and
Second, defendants John Langenbach and Judy Lanfri did not believe, in good faith, that their removal of plaintiff Joan Robinson was in the best interests of the company; and
Third, plaintiff Joan Robinson was thereby damaged.

The defendants do not quarrel with the wording of the instruction itself; rather, they argue the court should not have submitted it because Ms. Robinson's real claim was one of wrongful termination and not breach of fiduciary duty. For the reasons stated above, that is incorrect. Her claim was for breach of the defendants' duties to her as a shareholder. Her claimed damages were not lost wages but deprivation "of all financial benefit from her minority stock ownership … both presently and going forward into the future."

To the extent the defendants are arguing Ms. Robinson failed to support her allegations and their conduct was justified under the business judgment rule as being done for the best interests of the company, their argument is without merit. Ms. Robinson presented evidence the defendants ousted her entirely from Perma-Jack, that is, from its day-to-day operations, its corporate business structure, and its future as a closely held family corporation, as well as its physical location as she was denied access to the premises

12

despite her position as a director. She presented evidence the defendants did so in part so Mr. Langenbach could control Perma-Jack's payroll and increase his and his daughters' salaries. She presented evidence the defendants' actions were undertaken in bad faith, for their own good rather than for the good of the company, including copies of e-mails and surreptitious notes that supported her claim as to their motivations; evidence that she was never made aware of the grievances discussed in these private communications and notes; and other evidence indicating the defendants intentionally failed to provide Ms. Robinson with an opportunity to address her claimed shortcomings prior to their decision to remove her. Ms. Robinson also introduced evidence of the harm she suffered as a result of the alleged breach of fiduciary duty.

The defendants presented substantial contrary evidence that they acted for the good of the company; that Mr. Langenbach and his daughters worked very hard and earned their salaries; and that they removed Ms. Robinson because she was a bad manager and refused to do the hard work necessary to run the company. But the jury chose to believe Ms. Robinson's evidence rather than the evidence presented by the defendants. This Court does not act as a "super-juror" with veto powers. "All decisions as to what evidence the jury must believe and what inferences the jury must draw are left to the jury, not to judges deciding what reasonable jurors must and must not do." *State v. Jackson, 433 S.W.3d 390, 399 (Mo. banc 2014)*. The jury was entitled to believe Ms. Robinson's evidence. The circuit court did not err in overruling the defendants' JNOV motion.

### C.    *Evidentiary Issues Regarding Breach of Fiduciary Duty*

The defendants argue that even if Ms. Robinson made a submissible case, it was an

13

abuse of discretion to permit her to introduce evidence regarding the salaries and bonuses paid to Mr. Langenbach and his daughters. They do not argue the evidence was unduly prejudicial in light of its relevance but that it was entirely irrelevant because Ms. Robinson admitted the salaries were not excessive, so its only purpose was to prejudice the jury.

The circuit court "enjoys considerable discretion in the admission or exclusion of evidence." *Shallow v. Follwell, 554 S.W.3d 878, 881 (Mo. banc 2018), quoting, Lozano v. BNSF Ry. Co., 421 S.W.3d 448, 451 (Mo. banc 2014)*. "A circuit court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Id.* (internal quotations omitted). "This Court does not reverse a circuit court's judgment unless the error materially affected the merits of the action." *Id.*

The defendants' abuse of discretion argument is based on a misunderstanding of the purpose of introducing the salary evidence. Perma-Jack was of limited profitability and so had a limited pool of compensation from which to pay officers, employees, and agents. Ms. Robinson's theory was that Mr. Langenbach, with the approval of Ms. Lanfri, removed Ms. Robinson so the entire pool of Perma-Jack compensation would be controlled by him as president and disbursed only to him and his daughters as Perma-Jack's sole employees. That a significant sum of money was made available to Mr. Langenbach to direct as president of Perma-Jack would tend to make it more likely that he, with Ms. Lanfri's approval, removed Ms. Robinson to control that money.

Moreover, while the defendants filed a motion in limine to exclude this salary

14

evidence and renewed their objections when the evidence was introduced, they then introduced their expert's report containing Perma-Jack's total salary expenses for 2011 through 2015 and questioned their expert about Perma-Jack's value and profitability. A "complaining party cannot be prejudiced by the allegedly inadmissible evidence if that party offers evidence to the same effect as the challenged evidence." *State v. Miller, 372 S.W.3d 455, 474-75 (Mo. banc 2012)* (internal alterations and quotations omitted).

### III. BUYOUT OF CORPORATE SHARES FOR SHAREHOLDER OPPRESSION

After the jury verdict, the circuit court still had to determine Ms. Robinson's equitable claim for shareholder oppression. The circuit court's judgment explains the parties submitted this claim based on the evidence presented to the jury as well as expert testimony about the value of Ms. Robinson's Perma-Jack shares. The circuit court found the defendants had committed shareholder oppression but ordered a buyout of Ms. Robinson's shares rather than dissolution of the company under section 351.494. In so doing, the circuit court largely accepted the testimony of the defendants' expert and valued the shares at $59,000 as of June 2012, the month in which Ms. Robinson was forced out of her active role in the company. The defendants now argue the circuit court's finding of shareholder oppression was against the weight of the evidence and that it erred in ordering them to buy out Ms. Robinson's shares as a remedy for the oppression. Ms. Robinson argues the circuit court used the wrong date and standard in determining the fair value of her shares.

#### A. Standard of Review

When reviewing a court-tried case, this Court "will affirm the circuit court's

15

judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Ivie v. Smith, 439 S.W.3d 189, 198-99 (Mo. banc 2014), citing, Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976).* This Court reviews questions of law *de novo. Mo. Coal. for Env't v. State, No. SC 97913, 2020 WL 548731, at \*2 (Mo. banc Feb. 4, 2020).*

Matters of discretion are reviewed for abuse of discretion. Discretion is abused if a ruling "is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Fleshner, 304 S.W.3d at 87.*

### B.     Judgment of Shareholder Oppression Was Not Against Weight of Evidence

The defendants argue the circuit court used the wrong standard in finding oppression and that its finding that they engaged in oppression was against the weight of the evidence. "[A] claim that the judgment is against the weight of the evidence presupposes that there is sufficient evidence to support the judgment." *Ivie, 439 S.W.3d at 205* (alteration in original). "A circuit court's judgment is against the weight of the evidence only if the circuit court could not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment." *Id. at 206.*

Ms. Robinson brought her oppression claim under section 351.494(2)(b), which provides a shareholder can bring a claim if "[t]he directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent." *Id.* Although the statute does not define "oppression," Missouri courts have done so:

16

Oppressive conduct suggests "burdensome, harsh and wrongful conduct, a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members, or a visible departure from the standards of fair dealings and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely."

*Whale Art Co. v. Docter, 743 S.W.2d 511, 514 (Mo. App. 1987); accord Kirchoff v. Moto,*

*Inc., 482 S.W.3d 834, 837 (Mo. App. 2016).*

In reaching its judgment for Ms. Robinson, the circuit court relied on *Whale Art* and

quoted *Kirchoff* for the standard to be applied:

While alleged oppressive conduct is analyzed in terms of fiduciary duties, a claim of shareholder oppression is more than mere negligence or lack of reasonable care; it is burdensome, harsh, and wrongful conduct; it is a lack of probity and fair dealing resulting in prejudice; it is a visible departure from the standards of fair dealing and a violation of fair play.

*Kirchoff, 482 S.W.3d at 840-41.* The circuit court stated that it reached its finding of

oppression based on "the evidence adduced and the jury's earlier verdict regarding breach

of fiduciary duty against the defendants," but that it also separately found "that the

defendants' actions meet the requisite standard" based on its finding of the following facts:

[Mr. Langenbach] and [Ms. Lanfri] used their control of [Perma-Jack] to expel [Ms. Robinson], cut her off from [Perma-Jack] profits and put all compensation from [Perma-Jack] into the control of [Mr. Langenbach], leaving [Ms. Robinson] with unmarketable shares of stock, all without any attempt to discuss these actions in advance with [Ms. Robinson], give her any warning or attempt to negotiate some kind of stock buy-out or other financial accommodation. A discussion between [Mr. Langenbach] and [Ms. Robinson] in 2010, two years prior to the special meeting, regarding [Ms. Robinson]'s possible retirement is not sufficient. The Court finds that [Mr. Langenbach] and [Ms. Lanfri] actively coordinated between themselves and sought to conceal their plans and intentions from [Ms. Robinson], well in advance of the special meeting where she was voted out of [Perma-Jack].

The circuit court further found:

17

> The Court declines to find that the defendants' actions are shielded by the business judgment rule, in that the defendants did not act in good faith. "The business-judgment rule protects the directors and officers of a corporation from liability for intra vires decisions within their authority and made in good faith, uninfluenced by any consideration other than an honest belief that the action promotes the corporation's best interest. Sutherland v. Sutherland, 348 S.W.3d 84, 89-90 (Mo.App.W.D.2011)." Robinson v. Lagenbach [sic], 439 S.W.3d 853, 860 (Mo. Ct. App. 2014) (emphasis added). … Further, this Court must consider the evidence and reasonable inferences from the evidence at trial; ….

While the defendants presented probative evidence that they acted in good faith, the jury and circuit court chose to believe Ms. Robinson's contrary evidence. That evidence, detailed above and considered in the light most favorable to the judgment and verdict, fully supported the circuit court's finding of oppression.

The defendants argue the circuit court should have applied a more exacting standard for oppression, citing *Struckhoff v. Echo Ridge Farm, Inc., 833 S.W.2d 463, 466 (Mo. App. 1992),* for the point that "[d]issolution of a corporation is a drastic remedy and courts should resort to this procedure only to prevent irreparable injury, imminent danger of loss or a miscarriage of justice." *See also Herbik v. Rand, 732 S.W.2d 232, 234-35(Mo. App. 1987)* (explaining defendants, to support dissolution, must have "acted with an intent to subserve some outside purpose, regardless of the consequences to the company, and in a manner inconsistent with its interests" (emphasis omitted)). *Herbik* involved a case against a corporation, and the relief requested was dissolution; further, the federal case it cited relied on New York rather than Missouri law. *Struckhoff* also addressed when to order the "drastic remedy" of dissolution, and it and the other cases on which the defendants rely dealt with a single act of oppression.

18

By contrast, Ms. Robinson withdrew her request for dissolution before the ruling on her oppression claim, and the circuit court specifically chose not to impose what it called the "drastic remedy" of dissolution. Instead, it ordered a buyout. In so doing, it relied on multiple cases holding, as defendants acknowledge, "the court is not limited to the remedy of dissolution but may consider other appropriate alternative equitable relief." *Fix v. Fix Material Co., 538 S.W.2d 351, 357 (Mo. App. 1976); accord 21 West, Inc. v. Meadowgreen Trails, Inc., 913 S.W.2d 858, 867 (Mo. App. 1995)* ("Courts are not limited to the remedy of dissolution and may, in equity, consider appropriate alternative … relief.").

The use of equitable remedies approved in these cases is consistent with section 351.850, titled "Court action to protect shareholders." It specifically authorizes a buyout at fair value as a remedy for oppression under section 351.494 (the statute Ms. Robinson pleaded was violated), stating in relevant part:

> [A] shareholder of a statutory close corporation may petition the circuit court for any of the relief described in section 351.855, **351.860** or 351.865 if:
>
> (1) The directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, **oppressive**, fraudulent, or unfairly prejudicial to the petitioner, whether in his capacity as shareholder, director, or officer, of the corporation;
> ….
> (3) There exists one or more grounds for judicial dissolution of the corporation **under section 351.494**.

*§ 351.850.1* (emphasis added).

Section 351.860.1 provides, in relevant part, that if ordinary remedies such as damages or appointment of an appraiser are not adequate, then a court may order dissolution, or, instead, may order a purchase of shares and provides guidance in

determining their value. Here, the circuit court specifically found, in light of defendants' oppression of Ms. Robinson, continued ownership of the Perma-Jack stock by the three siblings was untenable as it put Ms. Robinson in the position that her shareholder interest was worthless. As a result, the circuit court ordered a buyout at fair value as the proper remedy. The circuit court did not err in so ordering.

### C.      Fair Value Determination

The parties do not disagree that, if the circuit court properly ordered a buyout, then Ms. Robinson is entitled to the "fair value" of her shares. Ms. Robinson argues the circuit court abused its discretion and erroneously applied the law in determining "fair value," however, by (1) using as the date of valuation the date she was forced out of the company, and (2) applying marketability and minority discounts to arrive at a fair value determination of her shares as of that date. This Court rejects these arguments.[7]

It is important to note that "fair value" is not the same as "fair market value." The latter has a well-established and universally recognized meaning:

> "Fair market value" … is a phrase without ambiguity in the law. It means "the price which property will bring when it is offered for sale by an owner who is willing but under no compulsion to sell and is bought by a buyer who is willing or desires to purchase but is not compelled to do so." *Carter v. Matthey Laundry & Dry Cleaning Co.*, 350 S.W.2d 786, 794 (Mo. 1961). See also MAI 16.02 (3rd. ed. 1981). Fair market value is not determined by value to the owner alone; it is measured also by the price that one who wishes, but does not need to buy, will pay.

*Peterson, 783 S.W.2d at 900.* Accordingly, fair market value is a hypothetical metric that asks what price an informed buyer and an informed seller would agree on when neither

---

[7] The standard of review for issues tried in a bench trial is set out earlier in this opinion.

20

must act, but both are willing. *Id.*[8]

The parties here agree fair value is a broader, equitable concept. As this Court has long noted, the concept of fair value "is not susceptible of determination by any precise mathematical computation and no one formula or figure is binding or conclusive." *Flarsheim v. Twenty Five Thirty Two Broadway Corp.,* 432 S.W.2d 245, 255 (Mo. 1968).

In *Flarsheim*, this Court advised it is up to the circuit court to determine what constitutes fair value based on the evidence presented and expert testimony, stating:

> From among the extreme claims of interested parties, the widely varying opinions of financial experts and the extensive business and other records, the court must select a figure it deems to be in accordance with the legislative intention in vesting the court with the determination of the fair value of dissenting shares.

*Id.*

Other cases have considered numerous factors depending on the facts and circumstances of the case, including factors impacting the company's value and the intrinsic value of its stock, such as earning capacity, capacity to pay dividends, investment

---

[8] Dicta in a case decided by this Court more than a half-century ago suggested that, uniquely under Missouri law, "fair value" and "fair market value" have the same general meaning. *Phelps v. Watson-Stillman Co.,* 293 S.W.2d 429, 433 (Mo. 1956). In *Phelps*, dissenting shareholders asked the Court to determine the fair value of their shares under section 351.455, RSMo 1949. *Id. at 431*. In the course of determining fair value, *Phelps* opined, "In the various statutes the terms 'value,' 'fair value,' 'fair cash value' and 'fair market value' are abstract and in a sense perhaps meaningless; they nevertheless have the same general meaning." *Id. at 433* (internal citation omitted).

Whether the Court just meant the different terms meant the same thing in that case, or whether it meant to say these terms always had the same meaning in 1956, fair market value now, as just discussed, has a very specific and universally understood meaning, and that meaning is different than the meaning of fair value under the Missouri statutes and case law discussed above and later in this opinion. To the extent dicta in *Phelps* could be read to suggest otherwise, it should no longer be followed.

21

value, book value, anticipated return on capital, history and nature of the business, and economic outlook. *See Weigel Broad. Co. v. Smith, 682 N.E.2d 745, 750 (Ill. App. 1996); see also Dreiseszun v. FLM Indus., Inc., 577 S.W.2d 902, 908 (Mo. App. 1979)* (discussing fair value in the context of dissenting shareholders and stating that the "usual criteria ... useful for evaluating the fair value of the stock, includ[e] ... business difficulties, capital situation, inventories, dividend history, book value and market value").

Courts also have relied on the appraisal of valuation experts who appropriately consider relevant factors and circumstances. The general rule applies that the trier of fact may assign to expert testimony "just so much weight and credit as the [trier of fact] may deem it entitled to when viewed in connection with all the circumstances." *State v. Quilling, 256 S.W.2d 751, 752 (Mo. banc 1953).*

Finally, the legislature has provided some guidance. As noted above, section 351.860.2 provides a court should consider all relevant evidence in determining fair value. It specifically says this includes evidence of "the going-concern value of the corporation, any agreement among some or all of the shareholders fixing the price or specifying a formula for determining share value for any purpose, the recommendations of appraisers, if any, appointed by the court, and any legal constraints on the corporation's ability to purchase the shares." *§ 351.860.2.*

If these authorities could be summarized, it would be to say there is no fixed set of factors a court must review to determine "fair value." Rather, the court determines fair value by taking into account the context and idiosyncrasies of the particular situation. In other words, context is crucial in a "fair value" analysis, but, unlike in a "fair market value"

22

analysis, the context is not supplied by what two hypothetical and willing participants would pay in an arms-length transaction but rather must be discerned from the real world and the specific parties to the relevant dispute.  *See id.*

Here, the circuit court had before it the testimony of one expert for the defendants and one expert for Ms. Robinson in determining fair value.  These experts – who diverged in their analyses on certain critical points – looked at Perma-Jack's historical income streams (i.e. cash flow streams), risk grades (i.e. the risk associated with the cash flow), expected earnings, net asset value, general business history, and the value of other comparable small businesses.

After reviewing this testimony and the other evidence, the circuit court found the approach taken by Ms. Robinson's expert had deficiencies, including use of an inappropriate date for valuing her stock, which led it to reject that approach.  Instead, it found the approach taken by the defendants' expert more persuasive and specifically adopted the valuation date of June 2012 and the share value of $59,000.[9]

Ms. Robinson contests two of the underpinnings for the defendants' expert's testimony.  First, she notes the expert discounted the fair value of her shares by imposing a marketability discount and a minority shareholder discount.[10]  She asserts that, even if

---

[9] The defendants' expert used financial information from September 2012 to value the stock as of June 2012, as that information was the best available to value the stock as of Ms. Robinson's June 2012 removal.

[10] "A 'marketability discount' is used to reduce the value [of stock] to reflect that there is no established public market for the shares of the entity. As a result, the shareholder's investment is less liquid or more difficult to sell or liquidate." *Thill v. Thill, 26 S.W.3d 199, 204 n.6 (Mo. App. 2000)*.  In contrast, "[a] 'minority discount' is intended to reflect that a minority shareholder does not have sufficient shares to exercise legal control of the

such discounts may be appropriate when determining fair value of minority shares willingly sold to third parties on the open market, such discounts are inappropriate in determining fair value when a minority shareholder is forced to sell back his or her shares to an oppressive majority shareholder or director.

In support, Ms. Robinson relies on *Swope v. Siegel-Robert, Inc., 243 F.3d 486, 492-93 (8th Cir. 2001)*. *Swope* held, in an analogous situation involving the sale of a dissenting shareholder's minority interest, that, under section 351.455, Missouri did not permit the application of marketability and minority discounts in determining the fair value of the forced sale of the minority shareholder's shares. *Id. at. 497*. It reasoned that application of the discounts in a fair value analysis would penalize minority shareholders and encourage misdeeds by the majority and concluded that, absent extraordinary circumstances, the lack of a ready market and the lack of majority control simply were not relevant to the fair value of corporate stock. *Id. at 494-96*. Moreover, it reasoned that sale to the majority shareholder rather than to a third party means the majority shareholder is acquiring more control, rather than a true minority interest, making it unfair to apply the discounts against a minority shareholder who did not pick the fact or timing of the sale. *Id. at 493, 495*.

Ms. Robinson is correct that the rationale for applying a minority and marketability

corporation, [and] a buyer would therefore pay less for shares that did not constitute a majority interest." *Id. at 204 n.7*; *see also King v. F.T.J., Inc., 765 S.W.2d 301, 305 (Mo. App. 1988)* ("[A] minority discount reflects that the seller of a minority stock interest has no controlling voice in corporate affairs. Therefore, the minority nature of the interest may be said to diminish the worth of the stock itself.").

24

discount usually would have limited application in the case of a court-ordered sale to a majority stockholder. But the circuit court below did not say otherwise. It did not purport to determine any broad principle of law as to the application of these discounts. It simply agreed with the defendants' expert that, *on these particular facts*, in which the jury already had awarded Ms. Robinson the benefit of the increase in value of Perma-Jack stock between 2012 and 2017, a discount was proper. Ms. Robinson's own expert testified during the jury trial that her damages should be comprised in large part of the compensation that would have been available to her for a period of four years following her removal.

It was based on that testimony that the defendants' expert, during the later bench trial, said a discount should be applied to the value of Ms. Robinson's stock to avoid double recovery. And in fact Ms. Robinson's claims of injuries due to the breach of fiduciary duty and to shareholder oppression clearly did overlap.[11] In the face of such testimony, the circuit court simply considered the distinction between fair market value and fair value,

---

[11] Her third amended petition claimed as injury for breach of fiduciary duty that:

> In perpetrating the foregoing, Langenbach and Lanfri have breached the fiduciary duties they owed to Robinson. As a direct and proximate cause of one or more of these breaches, Robinson has been damaged in that she has been deprived of all financial benefit from her minority stock ownership in [Perma-Jack] both presently and going forward into the future ….

In seeking damages resulting from shareholder oppression, her petition asserted:

> By removing Robinson as an officer of [Perma-Jack], terminating her and John's employment with [Perma-Jack], and excluding her from the day-to-day operation of [Perma-Jack], Langenbach and Lanfri have eliminated and usurped all financial benefit of Plaintiff's ownership of her shares of [Perma-Jack] and her status as a [Perma-Jack] officer. … In so doing, Langenbach and Lanfri have acted in an oppressive manner ….

analyzed the evidence presented by the defendants' expert, Mr. Prost, including his consideration of the ongoing value of the company in determining its fair value, rejected the testimony of Ms. Robinson's expert as not being consistent with the approach taken generally in determining fair value, took into consideration the unique expenses caused by the ongoing litigation, and said:

> Both parties' treatises pointed out that there is no hard and fast rule regarding the use of discounts to determine fair value. Trugman observed that "the case law is literally all over the place" (D. Ex. E at 624). Pratt agreed that the use of discounts "vary considerably from state to state," and that "some allow both lack of control and lack of marketability discounts" (P .Ex. 31 at 931). … Mr. Prost's fair value approach followed the methodology advocated by the parties' treatises to provide [Ms. Robinson] with the value of her shares unaffected by circumstances flowing from her termination. Using 2012 income, Mr. Prost made a normalizing adjustment for legal fees, because the extraordinary fees paid during 2012 would obviously not have been incurred absent [Ms. Robinson's] termination. There was no need to "normalize" 2012 salaries as both [Mr. Langenbach] and [Ms. Robinson] presumably paid themselves at a rate they jointly deemed appropriate that year.
>
> … Any fair value analysis necessarily includes some anticipated future return on capital. Thus, Mr. Prost applied marketability and minority discounts primarily, but not exclusively because the jury had already awarded [Ms. Robinson] a return on capital for a period of years following her termination based upon Mr. King's [Ms. Robinson's expert] testimony at the original trial. The Court finds this to be reasonable. Mr. Prost concluded a fair value of $59,000 for Joan's 1/3 interest in [Perma-Jack] as of June, 2012.

The long-settled rule provides that circuit courts sitting in equity are "vested with a broad discretionary power to shape and fashion relief to fit the particular facts, circumstances and equities of the case before it." *Priorities USA v. State, 591 S.W.3d 448, 452 (Mo. banc 2020), quoting, Burg v. Dampier, 346 S.W.3d 343, 357 (Mo. App. 2011);* *see also State ex rel. Leonardi v. Sherry, 137 S.W.3d 462, 472 (Mo. banc 2004)* ("Any circuit court with jurisdiction over the parties and a controversy can render whatever relief

is required, be it equitable or a request for damages."). This Court cannot say, on these unique facts, the balance struck by the application of the discounts "shock[s] the sense of justice" or "indicate[s] a lack of careful consideration." *Fleshner, 304 S.W.3d 87*.

Ms. Robinson also argues the circuit court used the wrong valuation date in determining the value of her shares, arguing it should have used June 30, 2017, or another date in 2017, the year of the trial, rather than the month of her removal from the company in 2012. This Court again disagrees. The circuit court held it was appropriate to use the date Ms. Robinson was removed to determine fair value, reasoning:

> Fair value, however, contemplates a specific buyer and specific seller under identified circumstances, in this case, in the context of a shareholder oppression claim. The two methodologies contemplate different dates of valuation. Fair market value is appropriate if the Court would award a present day value, because fair market value necessarily includes the benefits (or burdens) of the company's operations since the allegedly oppressive conduct. On the other hand, fair value contemplates a valuation immediately before the oppressive conduct, so that the buyer … is neither punished by poor results nor benefitted by extraordinary results occurring in her absence.

In other words, using the date of removal avoided giving Ms. Robinson an amount for her shares that would be affected by what occurred after her ouster and, therefore, more accurately reflected their value.

In considering whether the circuit court abused its discretion in so ruling, this Court agrees with *21 West, 913 S.W.2d at 867-68*, that few, if any, Missouri cases address the question of the proper date of valuation in the context of a court-ordered buyout as a remedy for oppressive conduct. But it is helpful that, in the analogous situation addressed in dissenting shareholder statutes, section 351.870(4) specifically defines the "fair value" valuation date as the date of the action objected to by the dissenting shareholder: "'Fair

27

value', with respect to a dissenter's shares, *means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects*, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable[.]" (Emphasis added).  Sections 351.405 (dissenting shareholder in sale or exchange of assets) and 351.455 (dissenting shareholder in merger or consolidation) use comparable language in similarly providing that the objected-to conduct provides the date of valuation.

Missouri cases determining fair value in the case of dissenting shareholders, in reliance on these statutes, have used the date immediately preceding the action objected to as the date for valuation.  For example, this Court in *Flarsheim* stated:

> Under [section] 351.405 the "fair value" of the capital stock of a dissenting minority shareholder is to be determined by the courts as of the day prior to the date on which the vote was taken authorizing the sale of the corporate assets. The provision is the same as in the case of a shareholder who dissents to a consolidation or merger. Section 351.455. The term "fair value" as used in the valuation of shares of a dissenting shareholder is not a rigid criterion but establishes a flexible general standard for fixing the value between parties who are either unwilling or unable to agree. *Phelps v. Watson-Stillman Company*, 365 Mo. 1124, 293 S.W.2d 429, 433(2).

*432 S.W.2d at 255*.  Similarly, in *King, 765 S.W.2d at 304*, the court of appeals, when determining fair value under section 351.455 relating to the dissent from a merger, stated, "Fair value is to be determined as of the day prior to the date on which the vote approving the merger was taken."

The circuit court did not abuse its discretion in applying the principles set out in these analogous cases and determining that June 2012 – the month in which Ms. Robinson was removed – was the proper date for valuing her stock.

28

**IV.    THE CIRCUIT COURT DID NOT ABUSE ITS DISCRETION IN DECLINING TO AWARD PREJUDGMENT INTEREST OR ATTORNEY'S FEES**

**A.    Prejudgment Interest**

Ms. Robinson argues the circuit court abused its discretion in rejecting her request for prejudgment interest on her $59,000 damage award for oppression. Prejudgment interest is generally denied for claims that are not "fixed and determined," that is, for claims that are not liquidated, because "where the person liable does not know the amount he owes he should not be considered in default because of failure to pay." *Fohn v. Title Ins. Corp. of St. Louis, 529 S.W.2d 1, 5 (Mo. banc 1975)*. The valuation of Ms. Robinson's shares was not determined until trial and does not fit within the type of damages for which prejudgment interest normally applies.

But when, as here, a party "seeks an equitable remedy, the trial court may be guided by the equitable principles of fairness and justice when determining whether to award prejudgment interest." *Health Care Found. of Greater Kan. City v. HM Acquisition, LLC, 507 S.W.3d 646, 668 (Mo. App. 2017)*; *see also Boyle v. Crimm, 253 S.W.2d 149, 157 (Mo. 1952)*; *Carpenter v. Countrywide Home Loans, Inc., 250 S.W.3d 697, 704 (Mo. banc 2008)*. The circuit court's judgment is reviewed for abuse of discretion. *HM Acquisition, 507 S.W.3d at 669*. The defendants argued prejudgment interest should not be awarded because Ms. Robinson did not demand, prior to the jury trial, that they purchase her stock for fair value. In these circumstances, the circuit court decided not to exercise its equitable authority and, instead, denied prejudgment interest due to the unliquidated nature of Ms. Robinson's damages, stating:

29

[Ms. Robinson] never made any demand upon the defendants that they buy her stock, until she filed suit. Further, the stock value is disputed and is in the nature of unliquidated damages - there are a number of different ways that [Ms. Robinson]'s stock value could be calculated in this closely held company. For the foregoing reasons, as well as those reasons cited by the defendants, the Court hereby DENIES [Ms. Robinson]'s motion for prejudgment interest.

This Court does not find the circuit court abused its discretion in so holding.

### B. Attorney's Fees

Ms. Robinson recognizes that when, as here, no statute or contract entitles her to attorney's fees, she normally would be denied them under the "American Rule," which states that, "absent statutory authorization or contractual agreement, each party bears the expense of his or her own attorney's fees." *Tupper v. City of St. Louis, 468 S.W.3d 360, 374 (Mo. banc 2015)*. But she notes Missouri cases give a court discretion to award fees if there has been intentional misconduct, *Tupper, 468 S.W.3d at 374*, and "in unusual or extremely complicated cases in which the parties have had to take novel legal actions to achieve a result.'" *City of Aurora v. Spectra Commc'ns Grp., LLC, 592 S.W.3d 764, 793 (Mo. banc 2019), quoting, Lipic v. State, 93 S.W.3d 839, 843 (Mo. App. 2002)*.

These exceptions did not make it an abuse of discretion to refuse to award attorney's fees here. As in *City of Aurora*, while "this is a complicated case, the record does not reflect [plaintiff] took any novel legal actions." *Id.* The determination of the facts and law may have been cumbersome and taken many years, but the actual legal issues involved fall within established areas of law and do not constitute the extreme case in which it would be an abuse of discretion not to award attorney's fees.

Ms. Robinson also argues she should have been awarded attorney's fees because

30

Mr. Langenbach and Ms. Lanfri were improperly indemnified by Perma-Jack, whereas she has had to bear the costs of this litigation herself. Section 351.355.1 provides:

> A corporation … may indemnify any person who was or is a party … to any threatened, pending or completed action ... including attorneys' fees ... if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the corporation.

Ms. Robinson seizes upon the "good faith" standard in this statute to argue that, because the circuit court found the defendants did not act in good faith, they were improperly indemnified and she should be granted equitable relief to make up for their improper indemnification. But whether the defendants were appropriately indemnified would need to be raised in a derivative action and is not properly before this Court.

Moreover, Ms. Robinson acknowledges, as she must, that whether to award attorney's fees rests in the sound discretion of the circuit court. Here, the circuit court declined to award attorney's fees because "in addition to being reluctant to deviate from the usual rule, the Court further finds that it would not serve the interests of public policy or the purpose of Section 351.355.1, which permits indemnification for corporate officers serving in their capacity, taking actions which may result in litigation." This Court finds no abuse of the circuit court's broad discretion in this area.

## V.    CONCLUSION

For the reasons set forth above, the judgment of the circuit court is affirmed.

_____
**LAURA DENVIR STITH, JUDGE**

All concur.

31